25   201
104   34
25   201
107   32

## MARTIN'S EXECUTRIX *vs.* MARTIN.

1. Trover for the conversion of a stolen slave cannot be maintained against the thief before the institution of a prosecution against him for the felony.
2. A rule which has become settled law, is binding on the courts, and should be followed.
3. In trover for the conversion of a slave, which the evidence tended to prove had been stolen by the defendant, plaintiff having introduced evidence to show that defendant and his accomplice, by whom the slave was run off, "were quite intimate and friendly, and acted in concert," *held*, that defendant might rebut this evidence by proving that his alleged accomplice "manifested great hostility to him."
4. A person who removed into the neighborhood of an impeached witness, about the time the latter left, is competent to testify to his general reputation in that neighborhood at that time.
5. A witness may testify to the general character of an impeached witness for truth and veracity, both from his own knowledge and from what he has heard from other persons ; and he may state that it is "very unfavorable."

APPEAL from the Circuit Court of Perry.

Tried before the Hon. THOMAS A. WALKER.

TROVER by Mary Martin, as executrix of Shadrach Martin, deceased, against Levi Martin, for the conversion of a slave named Jason. The record does not show what the pleas were ; but the defence seems to have been rested upon the ground, that the defendant, if guilty at all, had stolen the slave, and had never been prosecuted for the felony. One Joseph Smedley, who lived with the defendant during the years 1847 and 1848, testified, on behalf of the plaintiff, that

14

the defendant kept said slave harbored and secreted about his house and farm during the fall of 1847, and furnished him with the means of escaping from persons who were searching for him ; "that defendant then procured one Blake to take said slave off, and it was agreed between them, that Blake was to carry the slave off, sell him two or three times, and then take him to a free State, and send back to defendant one half of the proceeds of the sales ; that in accordance with this agreement said Blake came to the defendant's house in the night time, got the slave, and left the same night with him, and witness has never seen said slave or Blake since ; that Blake promised witness, on the night he left with the slave, that he would pay him $10 if he would keep this affair secret, and if he did not send back the money defendant would pay him to keep it secret." Plaintiff, having proved property in the slave, as executrix of her testator, his value, &c., and it being admitted that she was executrix, here rested her case.

"Plaintiff having introduced evidence tending to show that defendant and Blake were quite intimate and friendly, and acted in concert, and had agreed and procured Blake to run off the slave ; for the purpose of rebutting this evidence, defendant offered the deposition of Jane Butler, who testified, among other things, that she was acquainted with Blake, who taught school in her neighborhood in 1847, and boarded at defendant's house ; that the school was broken up in consequence of defendant's taking away his children some three weeks before the time had elapsed for which Blake had agreed to teach ; that after his school was broken up, Blake left defendant's house, and came and boarded with witness for about three weeks, and then left, and she has not heard of him since ; that during the time he boarded with her, *Blake manifested great hostility to the defendant*." Plaintiff objected to the reading of that portion of the deposition which is italicized ; but the court allowed it to be read "by way of rebuttal only," and plaintiff excepted.

"It was in evidence that the witness Smedley came from Autauga county to the defendant's house in Perry, remained there during most of the years 1847 and 1848, and then went back to Autauga. The defendant introduced one Champion Butler as a witness, who testified, that he had no

acquaintance in the neighborhood of the defendant, nor with the character of Smedley in that neighborhood, until he moved into said neighborhood some three or four years before this trial, and that Smedley had left the neighborhood before he removed into it. Plaintiff objected to said witness' testifying to said Smedley's character for truth, on the ground that he did not reside in Smedley's neighborhood, and did not know him personally, until after he had left Perry county and gone to Autauga, and did not know his character among his neighbors while he resided in Perry, but learned it after he (witness) had removed into the neighborhood where Smedley had lived. The court overruled the objection; and thereupon the witness testified, that he knew Smedley's general character for truth among his neighbors and those who knew him, and that his character was bad, and he would not believe him on oath."

The defendant also offered the evidence of Sophia Riley for the purpose of impeaching the witness Smedley, who testified " that she is acquainted with Smedley's general character for truth and veracity in his neighborhood and among his neighbors : his character in this respect is *very unfavorable.*" Plaintiff objected to the admission of the expression which is italicized ; but her objection was overruled, and she excepted. Plaintiff then read to the court the answer of this witness to the third cross interrogatory, which is as follows : " I state what I have said about Joseph Smedley's general character, both from my own knowledge, and from what I have heard from others. I dont think I would believe him on oath ; this founded both on my own personal knowledge of him, and what others say of him ;" and thereupon again moved to exclude said evidence from the jury ; but the court overruled the objection, and plaintiff excepted. " There was no proof made or offered that plaintiff, or any one else, had prosecuted the defendant for stealing the said slave."

The court charged the jury, at the request of defendant's counsel, that, if they believed the evidence of Joseph Smedley, the defendant was guilty of a felony, and the private injury was merged in the felony, and plaintiff could not recover in this action until it was shown that she, or some one else, had prosecuted him for the felony. The plaintiff excepted to

this charge, and took a non-suit ; and she now assigns for error all the rulings of the court above stated.

I. W. GARROTT, for the appellant :

1. The idea that a civil remedy is merged in a felony, or suspended until the felon is criminally prosecuted, is unsustained by reason, is contrary to the spirit of the institutions of our country, and in practice is violative of the constitution of this State. The doctrine had its foundation in the law of forfeiture, as it existed in England, and has never had any reason in favor of its existence in this country. At the common law, the felon forfeited not only all his own goods, but also the stolen goods, unless the rightful owner recaptured them before their seizure by the public authorities.—4 Bacon's Abr., p. 340, title "Forfeiture" (B). If the owner did not pursue and appeal the felon, he lost his goods forever; and at common law there was no restitution on any prosecution whatever, except an appeal of larceny.—*Ib.* 341, § 6 ; *ib.* 162, § 10 ; 1 Hale's P. C., 546-7. Appeals of felony never have existed, and never can exist, in this country, until our constitution is altered or abolished ; because no man can be put on his trial for an indictable offence, except on presentment of a grand jury.—Const. Ala., art. 1, § 10. Even in England appeals of felonies have been abolished by stat. 59 Geo. III, c. 46.—1 Bac. Abr. 291. So that the common law, if admitted to exist here, would strip the owner of his goods forever, and not even mock him with the pretence of a remedy; the only remedy known to it having been taken away by the constitution.. The inconvenience and injury resulting from appeals was remedied by stat. 21 Henry VIII, c. 11, which gave the owner a writ of restitution of his *stolen goods* ; but as we have no such statute, we are still left where we would have been if it had never existed.

As the principle of the common law was, that the felon, on conviction, forfeited his lands and goods to the king, it was, of course, the king's interest that he should be prosecuted ; and hence the policy of requiring a criminal before allowing a civil prosecution. But with us, the felon does not, on conviction, forfeit his lands and goods, because " No attainder shall work corruption of blood nor forfeiture of estate."—Const.

Ala. art. 1, § 20. Why, then, should he, or his heirs, retain his estate, and use and enjoy it, while the man whom he has defrauded, and whose property he has stolen, is barred the right of recovery. *Ratione cessante, cessat etiam lex.*

By section ten of the first article of our constitution it is provided, "that no person shall be deprived of his life, liberty, or property, but by due course of law"; and in Middleton v. Holmes, 3 Porter 427, this court say: "If the defendant has not been tried for the felony, and should never be, he will never be liable to the plaintiff"; and such is the legitimate result of denying the civil action until the criminal is prosecuted. If then, from infancy, coverture, or any other cause, the owner is unable to prosecute, he is deprived of his property "without due course of law.". Again; the constitution (art. 1, § 14) provides, that "all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law, and right and justice administered, without sale, denial or delay." If the State can say to the owner of stolen property, You shall not recover your property unless you undertake and carry through a prosecution in my name against the felon, is this not a *"sale"* of the right of action, of which the price is the trouble, odium and costs of a criminal prosecution? If he refuses to accept these terms, and persists in his refusal, right and justice are *"denied"* him; and if he accepts them, and undertakes the prosecution, still he is *"delayed"* in his rights. Again; the provisions of the twenty-ninth section (art. 1) are worthless, if the doctrine asserted by Middleton v. Holmes, *supra,* is established as law.

The case of Beasley v. Mitchell, 9 Ala. 780, is the only case of like character with the present. The cases of McGrew v. Cato's Ex'rs (Minor's R. 8), Morgan v. Rhodes (1 Stew. 70), and Middleton v. Holmes (3 Porter 424), were all cases for killing slaves—that is, cases which *prima facie* involved felonies in their commission; and the case of Blackburn v. Minter (22 Ala. 615), was for an injury to the person who brought the suit. These cases do not necessarily involve the principle contended for in this case; and if they do, it is submitted, they are in conflict with the case of Beasley v. Mitchell, *supra,* in which it is directly decided that the owner of stolen

goods may maintain an action against a purchaser from the thief, without first prosecuting the thief, although the contrary was held in England in the case of Gimson v. Woodfall, 2 C. & P. 41. Now, if public policy demands a criminal prosecution before the injured party shall have a remedy against the thief, a recovery certainly ought not to be allowed against the receiver of the stolen goods from the thief himself; if the object is that the thief shall be prosecuted, he surely ought not to be allowed to escape by putting the stolen goods out of his hands. But the court, in that case, say: "Although the impression is so common, that the person whose goods have been stolen cannot have restitution without a prosecution of the thief, yet it is entirely without foundation; the doctrine has no other foundation than as connected with forfeiture, and even then only to a limited extent."—p. 785. "If the owner has the right of recaption, we apprehend, it carries with it the right of suit to the same extent." This principle is believed to be decisive of this case.

The right to maintain a suit without a prosecution of the felon, has been held in seven of our sister States, and a very strong intimation given in the eighth, as will be seen by an examination of the following authorities: Ballew v. Alexander, 6 Humph. 433; Pettingill v. Rideout, 6 New Hamp. 454; White v. Fort, 3 Hawks 268; Allison v. Bank, 6 Ran. (Va.) 223; Boardman v. Gore, 15 Mass. 336; 1 U. S. Digest, p. 61, § 76, referring to Pr. (Ky.) Dec. 203; 1 Const. (S. C.) R. 231; Robinson v. Culp, 3 Brev. 302; Mitchell v. Mimms, 8 Texas R. 6; Arnandez v. Lawes, 5 Ann. La. R. 127; 6 ib. 65; ib. 472; Adams v. Childress, 10 Miss. 778.

Public policy does not require the maintenance of this doctrine, though it does require that crime should be punished. The temptation on the part of the owner to compound with the felon would be much greater, if he knew that he was forced to carry through a criminal prosecution before he could recover his property, than it would be if he had an immediate right of action, with the almost absolute certainty that the grand jury would present the criminal, at least after his exposure in the civil suit. But, conceding that public policy does require the maintenance of the doctrine, then it follows, that public policy—in other words, the public, for

Martin's Executrix v. Martin.

the promotion of the public interests—demands the use of private property. But how can the public take private property "without just compensation"?—See 5th Amendment to U. S. Const. The doctrine cannot be carried out in practice, without either forcing the owners of property to expend their own labor, time and money for the use of the public, under penalty of its entire loss in case of their refusal, or depriving them at once of their property without any compensation whatever.

2. The court erred in allowing Mrs. Butler to testify that Blake " manifested great hostility to the defendant." It does not appear that defendant was present, or had anything to do with producing such hostility ; nor was it shown whether the hostility was manifested by words, or by acts : if by acts, they ought to have been proved : and if by words, the evidence was hearsay. Without this proof, it was but the opinion or conclusion of the witness from such acts or words.

3. Champion Butler was incompetent to testify to the general character of Smedley.—1 Green. Ev. § 461 ; Douglass v. Toucey, 3 Wend. 352 ; 2 Stark. Ev. 146 ; 3 S. & R. 336 ; Hadjo v. Gooden, 15 Ala. 718.

4. The evidence of Sophia Riley was improperly admitted. 1 Green. Ev. 461; 2 Stark. Ev. 146 ; 3 S. & R. 336 ; 15 Ala. 718.                           ?

JOSEPH R. JOHN and WM. M. MURPHY, *contra:*

No action can be maintained against the defendant, upon the facts shown by the record, until he has been prosecuted. Morgan v. Rhodes, 1 Stew. 70 ; McGrew v. Cato, Minor's R. 8 ; Middleton v. Holmes, 3 Porter 424 ; Blackburn v. Minter, 22 Ala. 614 ; 6 B. & C. 551 ; 1 Hale's P. C. 546.— The case of Beasley v. Mitchell, 9 Ala. 780, does not conflict with the cases above cited, as it only decides the law as to innocent purchasers. The rule could not operate in that case, as the defendant was guilty of no offence, and there could be no compounding of a felony between them.

CHILTON, C. J.—Whether, if the question were an open one, or for the first time before this court, we should be disposed to hold that an action to recover stolen property might

not be maintained against the thief before instituting a criminal prosecution for the felony against him, is not now a matter of inquiry with us ; but shall we depart from an unbroken current of decisions, extending back to the first organization of the court, is the question presented by the able argument of the counsel for the appellant.

If, as he insists, these decisions are opposed to the constitution of the State, or of the United States, then it would be our duty, as well as our pleasure, to overrule them. But we do not so regard them.

It is insisted, that to deny the owner of the goods a civil remedy until he prosecutes the thief, and to deprive him of all remedy against the felon should he never institute such prosecution, is to deprive him of his property without due course of law, in violation of the tenth section of the first article of the constitution. But, if such was the course of the law when the constitution was formed, as it undoubtedly has always been by the common law, it certainly amounts to no violation of either the letter or spirit of this provision.—To bring the case within the constitutional inhibition, it must be shown that requiring a public prosecution for the felony, as a pre-requisite to an action to recover for the property stolen, is unlawful—not in accordance with the due or regular course of law ; and this takes us to where we started—to the inquiry, is it the law ?

The same answer holds good to the objection, that the principle, as several times asserted by this court, is violative of the fourteenth section of the first article of the constitution, which declares that " all courts shall be open, and every person, for an injury done him in his lands, goods, person, or reputation, shall have remedy by due course of law ; and right and justice administered, without sale, denial or delay."

The object of this provision was, not to interfere with, but to secure the regular administration of justice in every case according to the forms which the law prescribes. It does not operate, nor was it intended, to prevent those delays necessarily consequent upon the administration of justice. All courts are open, but parties must bring themselves within the law and the practice adopted in them, before they can invoke their aid in asserting remedies. The Chancery Court is open for

the investigation of frauds at the suit of creditors against their debtors, but the creditor must first reduce his demand to judgment. So, a creditor may redeem the lands of his debtor under certain circumstances, but he must wait until he gets a judgment. The endorsee has his remedy against the endorser of a promissory note, but he must come into court generally with a judgment and return of *nulla bona* against the maker, or the door of the court is forever closed against him. No one would contend that these laws, affixing conditions precedent to a right of recovery, were opposed to this clause in the fundamental law. Just so, with regard to the law before us. Public policy, and a just regard to the interest of the whole community, demand that felons should be brought to punishment, and should not be permitted to go at large, and plunder and prey upon the community at pleasure. In cases of larceny, no one is better calculated to become the prosecutor than the party whose goods have been feloniously taken and carried away. He is presumed to be more cognizant of the facts than any one else, and is therefore better prepared to conduct the prosecution to a successful termination. It is the duty of every good citizen, in consideration of the protection which he himself receives by the strong arm of the law, to see that offenders do not go unpunished, and to prosecute them for violations of the criminal code; and we see no reason why the law may not, in cases of this character, superadd the strong motive of self-interest, as an additional inducement to such prosecutions. Aside from such inducement, the temptation to compound felonies, or, at least, to let offenders pass unpunished, would be so great as, in many cases, to suppress prosecutions. To withhold such temptation, and as a stimulus to prosecute the offender, were among the reasons which lie at the foundation of the rule as it obtained at the common law—reasons which operate as strongly now as they did upon our common-law ancestors; and although other reasons, founded upon the forfeiture of the felon's goods to the crown, were then superadded, which do not now obtain with us, yet the rule, although it works in many cases an apparent hardship, is not without considerations of sound public policy to sustain it. At all events, it is firmly established by numerous decisions of this court, to overrule which would fur-

nish a precedent for unsettling the law far more injurious in its consequences than the rule itself.—McGrew v. Cato's Ex'rs, Minor's R. 8 ; Morgan v. Rhodes, 1 Stew. 70 ; Holmes v. Middleton, 3 Porter 427; Minter v. Blackburn, 22 Ala. 613.

A rule that has become settled law, is binding upon the courts, and is to be followed.—1 W. Bl. R. 181; 1 Eden 250; 7 Bing. 279 ; 3 Ves. 529 ; 7 *ib.* 199 ; Ram on Judgt. 33, and cases cited. The case of Beasley v. Mitchell, 9 Ala. 780, was a correct decision, and is not opposed to the previous adjudications of this court, although, in delivering the opinion, the judge uses general language, which, if applied to any other than the facts presented by that case, might be calculated to mislead. That was a suit against a third party, who innocently acquired the goods. Here the action is against the alleged thief. Bearing in mind this distinction, there is no incongruity between that case and this.

The plaintiff having introduced proof tending to show that the defendant and Blake were quite intimate, friendly, and acting in concert, it was competent for the defendant to prove that such intimacy or friendly relations did not exist. The proof, therefore, made by Mrs. Butler, at whose house Blake boarded at the time of the alleged intimacy, was strictly rebutting. Nor is it objectionable as stating a conclusion of the witness. She says, " he manifested great hostility to the defendant Martin." The plaintiff had proved one condition of the mind, viz., that defendant and Blake were friendly ; this is proof of the opposite *status*, and if the plaintiff had desired the witness to be more specific as to the manner in which the alleged hostility was manifested, he should have propounded suitable interrogatories eliciting such explanation.

As to the testimony of Champion Butler, we need only remark, that he was not a witness sent into the neighborhood by the party introducing him to learn the general character of the witness Smedley. He removed into the neighborhood where Smedley had lived, as we may infer from the bill of exceptions, about the time Smedley left it, and it was competent for him to prove the general character of the witness at the time the latter left. Suppose Smedley had resided a great length of time, say forty years, in the neighborhood to which Butler removed, and during all that time had enjoyed a most

unblemished reputation for truth and veracity; would it not have been competent for the party introducing him to prove this, to rebut evidence of bad character in a neighborhood to which he had recently removed, and where he had resided for only a short time? It clearly would. The proof here offered is but the assertion of the same principle differently applied.

The bill of exceptions fails to show any error in the admission of the testimony of the witness Riley. It does not appear that she had deposed to anything except Smedley's general character, and the answer objected to is, "I state what I have said about Joseph Smedley's general character, both from my own knowledge, and what I have heard from other persons," &c. In Hadjo v. Goodwin, 13 Ala. R. 718, it was held, that a witness may depose to the general character of another, if he swears he is acquainted with it in the neighborhood in which he lives, although he has never heard any of the neighbors speak of his character for truth. This assumes, what was here conceded, that a witness may have personal knowledge of the general character of another, aside from what he has heard others say about such character; and the witness may well speak from such personal knowledge of general character, not, however, from personal knowledge of the witness' unworthiness aside from his general reputation or character. That the general character for truth and veracity of Smedley was "very unfavorable," is, in common parlance, but another mode of saying that it was bad in that regard, and in our opinion is unobjectionable.

Having examined all the points raised by the assignment of errors, we are unable to perceive that the court mistook the law in any particular. The judgment must therefore be affirmed.