WILLIAM H. TYSON, APPELLANT, *vs.* CAROLINE MATTAIR, APPELLEE.

1. Property of the wife vested in the husband previous to the married woman's law, is not affected by its provisions so as to make it her separate property.

2. A deed of gift to a *married woman and the heirs of her body,* to the said wife and her immediate offspring, to have and to hold the property to their " *own proper use and behoof forever,*" will not constitute a separate estate in her according to the principles and rules of Courts of Equity.

This case was decided at Jacksonville.

William H. Tison recovered a judgment in the Circuit Court of Columbia county against Henry Mattair, the husband of the appellee, on the 20th day of December, 1855. Upon this judgment execution was issued on the 31st day of January, 1856, which was levied on a negro slave named Primus, as the property of the defendant in execution. Caroline Mattair, the wife of Henry Mattair, defendant in execution, interposed her claim, under the statute, to the negro slave levied on, as her property.

On the trial of the right of property before the Court, (a jury being waived,) Tison, the plaintiff in execution, offer-

ed and read in evidence, the judgment and execution in his favor against Henry Mattair.

He also read in evidence the testimony of S. L. Niblack, who testified that the indebtedness for which the suit of Tison against Henry Mattair was brought, was for merchandize purchased of the firm of S. L. Niblack & Co., of which witness was a partner, but he has now no interest in the result of the suit; that in the year 1852 he was advised by his attorney that the property held by the heirs of Henry Jones (of whom the claimant is one,) under his deed, were subject to the debts of the husbands of said heirs; that he recollects of seeing the boy Primus in the possession of Henry Mattair about the year 1840 or 1841, and that he has been in his possession ever since.

A. Y. Allen, a witness for plaintiff in execution, testified that the boy Primus was in the possession of Henry Mattair in the year 1842.

Caroline Mattair, the claimant, offered and read in evidence a deed of gift from her father, Henry Jones, established in lieu of the original which had been destroyed, as follows:

## DEED OF GIFT.

STATE OF FLORIDA: In the Circuit Court of Columbia county, December 21, 1847, present the Honorable Geo. W. Macrae, Judge of said Court.

Caroline Mattair
    vs.                              } Motion to establish lost deed.
The executors of Henry
    Jones, deceased.

It having been made to appear to the satisfaction of the court that the original deed of gift from Henry Jones, deceased, to Caroline Mattair, was destroyed among the files of papers in the clerk's office, and the same had heretofore

been recorded: on motion of W. M. Ives, Esq., attorney for said Caroline Mattair, it is ordered that the paper writing herein filed be established in lieu of the original, in the words following, the same being satisfactorily proved to be a substantiol copy of the deed so destroyed, viz:

This indenture, made this third day of November, one thousand eight hundred and forty, between Henry Jones, of the county of Columbia and State of Florida, of the one part, and Caroline Mattair, youngest daughter of the before named Henry Jones, of the same county and State, of the other part, witnesseth, that the said Henry Jones, for and in consideration of the natural love and affection which he has and bears unto the said daughter Caroline Mattair, and also for and in consideration of the sum of one dollar to him in hand paid by the said daughter Caroline, at and before the sealing and delivery hereof, the receipt whereof is hereby acknowledged, have given, granted and enfeoffed and confirmed unto the said Caroline Mattair, wife of Henry Mattair, and the heirs of her body, the following description of property, to wit: a negro man named Primus, aged about twenty-three years; a negro woman named Clarissa, aged about 17 years, and a negro man named William, aged about 12 years, the said Caroline Mattair and her immediate offspring to have and to hold the above described property to their own proper use and behoof forever.

In witness whereof, I have hereunto placed my seal and affixed my signature the time and date above stated.

HENRY JONES, [*Seal.*]

Recorded February 2, 1848.

Joseph M. Crews, a witness for the claimant, testified that in 1842 he had a conversation with Henry Jones, the father of the claimant, who stated that he had deeded the

boys Primus and Bill, and the woman Clarrissa, to his daughter for her own use; that he had worked hard for the property and he wanted his daughter to have it, so that it should not be subject to Henry Mattair's debts at any time. It has been generally understood that both these boys belonged to Mrs. Caroline Mattair. Witness knows that Henry Mattair has been refused credit repeatedly, as far back as 1850, on account of the negroes belonging to his wife. He has several times tried to sell these negroes, but his wife would not agree to it, and the trades were abandoned. The firm of S. L. Niblack & Co. was composed of William H. Tison, the plaintiff in execution, and S. L. Niblack. S. L. Niblack, one of the firm, knew that these negroes belonged to Mrs. Caroline Mattair before this debt was created.

Asa A. Stewart, another witness for claimant, testified that in 1838 the negroes Primus and Bill belonged to Henry Jones, the father of the claimant. Witness was told by Jones that he had deeded certain property to his children already married, and that he would deed certain property to his daughter Caroline when she married, and mentioned the negro boy Primus as one he would give or deed to her. After Caroline married, the boy Primus went immediately into her possession, and her father Jones called him Caroline's negro. It has been generally known that these negroes belonged to Mrs. Mattair for years back, at least for eight years back.

Douglas O'Neil, another witness for the claimant, testified that he heard Henry Jones declare, in relation to certain property which he had given to his daughter Caroline, that he was going to make it safe to her and to her children, that she was not in good health and that he intended that what he gave her should be secure so that she might always have the benefit of it, and not be subject to any per-

son's debts, and that the boy Primus was one of the ne-groes that was given to Caroline Mattair. The two boys have always been considered Mrs. Caroline Mattair's. Henry Mattair is a dissipated, improvident man, and Henry Jones knew the fact. Has heard Jones express this as one of the reasons for his giving the property to his daughter sepa-rately.

Charles B. Collins, another witness for the claimant, tes-tified that he was called upon by Henry Jones, while he, witness, was Clerk of the Court, to draw a deed, which he did, and in that deed he gave to his daughter, Mrs. Caro-line Mattair, certain negroes. To the best of witness' recol-lection, the negroes were Primus, Bill and Clarissa, which negroes he gave to his daughter Caroline Mattair during her natural life, and at her death to go to her children.

In the opinion pronounced by the judge in the Court be-low, it is stated, that it "further appears from the record that said Henry Mattair became indebted to S. L. Niblack & Co. in two promissory notes, one dated January 29, 1853, and the other dated March 20, 1854, and that the judgment in favor of the plaintiff in execution was re-covered upon said notes."

The Court below gave judgment for the claimant, and the plaintiff in execution appealed.

*Hilton & Fleming* for appellant:

It is contended for the claimant, and was so held by the Court below, that by virtue of the second section of the act of March 6, 1845, the negro slave Primus, levied upon under the plaintiff's execution, is the separate property of the wife of the defendant in the original suit, and, as such, not subject to be taken in execution for her husband's debts. That section reads as follows: "Married women may *hereafter*," &c. (See Thomp. Dig., 221.)

To this we reply, that before the passage of this act the said slave had become the property, by an absolute title, of the husband Henry Mattair. Having been conveyed by Henry Jones, in 1840, to his daughter Caroline Mattair, (then married,) by a deed which, had she been a *feme sole*, would have vested a fee simple right in said Caroline, (see Watts v. Clardy, 2 Florida R., 390,) said slave became *at once*, in accordance with the well-established principles of the common law, the absolute property of the husband. We feel that we should first beg pardon of the Court before arguing so plain a proposition, yet as it is decisive of the case, we adduce a few authorities, confining ourselves to the most elementary text-books, viz:

Roper's Husband and Wife: "Marriage is an absolute gift to the husband of all the goods, personal chattels and estate which the wife was actually and beneficially possessed of at that time in her own right, and of such other goods and personal chattels *as come to her during the marriage*."—Vol. 1, p. 166.

Bright's Husband and Wife is to the same effect, nearly in the same words: "Marriage is an absolute gift to the husband of the goods, personal chattels and estate of which the wife was actually and beneficially possessed, at the time of the marriage, in her own right, and of such goods and personal chattels as come to her during marriage."—1 Bright's H. & W., p. 34.

"But, as to chattels personal in possession which the wife hath in her own right, (says Blackstone,) as ready money, jewels, household goods and the like, the husband hath therein an immediate and absolute property, devolved to him by the marriage, not only potentially but in fact, which never can again *revest* in the wife."—2 Com., 435.

Broom's Commentaries on the Common Law may be referred to in the same connection, (*vide* p. 417.)

In Comyn's Dig., (Baron & Feme,) it is said:

"So if chattels are given to the wife after coverture, the interest vests in the husband."

We will trouble the Court with but one or two reported cases decided in accordance with these well-established principles. In the case of Carne vs. Brice and another, (M. & W. Exchequer R., vol. 7, p. 183,) it was held by all the Barons, that "the property in wearing apparel bought for herself by a wife living with her husband, out of money settled to her separate use before marriage and paid to her by the trustees of the settlement, vests by law in the husband and is liable to be taken in execution for his debts." See also Bird & Pegram, 76 English Com. R., p. 638; Washburn vs. Hale, 10 Pickering, 429, and Grisworld vs. Pennyman, 2 Conn., 564, (cited in notes to Bright on H. and W., vol. 1, p. 37.)

But it is said that there is no evidence that the husband "ever received this negro solely in the exercise of his marital rights and for the purpose of its appropriation to his own use." To which we answer that there *is* evidence, positive and explicit, of the husband's possession for years anterior to the act of 1845, from which possession the presumption of law is that he was in possession *as owner*, and it is for those who contend that he held possession for his wife (were not such a holding at common law an absurdity,) to show that he held in any other capacity than as owner. But we affirm that such a holding before the act of 1845 was an absurdity. The husband could not, had he desired so to do, hold personal property (not settled upon his wife) as her agent, so that his possession should be hers. The existence of the wife being merged in the husband, her possession would indeed be his, but not his hers. "Whatever may have been the intent of the hus-

band, (say the Supreme Court of Mass., in Washburn vs. Hale,) looking at it as a mere legal question, as the court are bound to do, the gift of money by a husband to his wife is merely void."—(Quoted in notes to 1 Bright's Husband and Wife, p. 37.)

The circuit judge has attempted to sustain his decision by reference to the ruling of the Supreme Court of New York in Holmes vs. Holmes, 4 Barb., 299—a ruling deemed by his honor "peculiarly in point," being, as he says, "under the same statute passed in that State." And we apprehend we have here the key to the error committed by the judge below in his ruling. The statute of New York is *not* the same as that of Florida. True, its first section tallies substantially with the first section of the Florida act, as does its third with our second; but then there is the second section of the New York act, designed, however abortively, to secure to women already married at the time of its passage, property previously theirs, *to which there is no corresponding section in the Florida law!* And it is under that section expressly cited that the case of Holmes vs. Holmes was ruled. It is in the following words : " The real and personal property and rents, issues and profits thereof of any female *now married*, shall not be subject to the disposal of her husband, but shall be her sole and separate property, as if she were a single female," &c. How different are the terms and purposes of this second section of the New York act from the second section of the Florida act, is seen by reference to the first line of the latter, as follows : " Married women may *hereafter* become seized or possessed of real and personal property during coverture, by bequest," &c. The purpose of the New York second section was to give to women already married a title to property acquired by them *previous* to the passage of the act; that of the Florida second

section to give to married women, whether married or not at the date of the act, their *future* acquisition.

Having thus briefly compared the provisions of the two acts, let us see what have been the rulings of the New York courts under their statute. His honor, our Circuit Judge, in rendering his opinion, had manifestly before him two New York decisions, viz: Snyder vs. Snyder, 3 Barb. S. C. Reports, 62, and Holmes vs. Holmes, 4 Barb., 295. He quotes from both, though only the latter is formally cited. When (for example) he says, "the true construction of this second section, therefore, is, that so far as there shall be any property upon which the law could operate, the same provisions contained in the first section for the protection of the property of females who should marry after the passage of this act, should be applicable to the property of females married before the passage of the act," he quotes nearly *verbatim* from *Snyder vs. Snyder*, 3 Barb. When, subsequently, however, his Honor is arguing to show that the negro, even though proved to be in the possession of the husband, must, so long as it could be traced, be deemed the wife's, he quotes expressly from Holmes vs. Holmes, 4 Barb. We need not repeat, that both these decisions were upon a section of the New York act not found in that of Florida. What we call to the especial attention of the Court is, that *both of these decisions are against the claimant* in the case now at bar. In Snyder vs. Snyder, Harris, J., ruled, that "there is nothing in the language of this section which indicates that the Legislature intended it should apply to the property which such females had at the time of the marriage or had acquired during coverture. On the contrary, the husband had, by virtue of the marriage, acquired a legal title to such property, and in no proper sense *could it be said to be the property of the wife.*" And so the judge decided against

the claim of the wife.   In Holmes vs. Holmes, Barculo, J., although when he says (as quoted by our Circuit Court) that "the act in question, if valid, most clearly gives this money to the plaintiff," (the wife,) he would seem to create hopes in favor of Mrs. Mattair, very summarily and effectively dashes them by deciding *against its validity*, because, 1st, "it is beyond the scope of legislative authority to destroy vested rights of property;" 2d, because "a violation of that clause in the Constitution of the State which declares that no person shall be deprived of life, liberty or *property* without due process of law;" and, 3d, because, "as regards the rights of property existing prior to its passage, by virtue of the marriage relation, *it impairs a contract within the inhibition of the Federal Constitution.*"

Our opponents, then, are placed between the two horns of a dilemma, from *both* of which it is impossible for them to escape without a fatal goring.   If they fly to Snyder vs. Snyder, we meet them with the language of Judge Harris, "that as to such property as the female had at the time of the marriage, or had acquired during coverture, the husband, by virtue of the marriage, acquired a legal title to such property, and in no proper sense could it be said to be the property of the wife."   Do they fall back upon Holmes vs. Holmes, we reply in the words of Judge Barculo, used in that case: "It is impossible, therefore, in my opinion, to avoid the conclusion that the act of April 7, 1848," (corresponding to ours of March 6, 1845,) "so far it is intended to affect *existing rights of property in married persons, is unconstitutional and void.*"

But mark! both of the fore-recited decisions were made on the second section of the New York act, with which no section of the Florida act corresponds; and, though the 3d section of the New York statute *is* substantially the same

as the second of the Florida statute, yet no one in the New York courts seems to have contended that their 3d section could or was intended to affect rights of property existing at the time of its passage.

In conclusion, we refer the Court to the late New York case of Perkins vs. Cottrell, 15 Barb., 446, in which it seems to have been definitely settled that "the second section of the act of 1848" was intended to apply only to property acquired after its passage and taking effect; also to Westervelt vs. Gregg, 2 Kernan, 202, (U. S. Dig., vol. 16, p. 344,) where it is held that "the statute of New York of 1848, for the better protection of the property of married women, cannot divest the husband of his right to a legacy to his wife under the will of a person deceased in 1840, and to obtain payment of which legal proceedings had been commenced by the husband and wife before the passage of the act, although the legacy had not been reduced to possession."

BALTZELL, C. J., delivered the opinion of the Court.

This is a claim on the part of Mrs. Caroline Mattair to a negro boy, Primus, levied upon to pay her husband's debts, under the execution of the plaintiff, Tison. Her title is asserted through a deed of gift from her father, Henry Jones, " to his youngest daughter, for and in consideration of natural love and affection, *to her and the heirs of her body*—the said Caroline Mattair and her immediate offspring to have and to hold the above described property to *their own proper use and behoof forever.*" From the proof in the case the property came to the possession of her husband, Henry Mattair, immediately after the marriage, about the year 1840, and has so continued ever since. Whether it shall be regarded as the possession of the wife, will depend upon the words and language

of this deed. If it creates a separate estate, independent of the husband, possession will follow the right, and he be regarded as holding for her, and his possession be hers.

"The words, *to and for her use*," "in a gift to a *feme* have been adjudicated insufficient to create a separate estate—so determined by the master of the Rolls, and his decision afterwards affirmed by the Chancellor." Jacobs v. Amyatt, 1 Mad. 376.

In Johns v. Lockheart, it was held "that a legacy to a *feme covert* to her *own* use and benefit," is not to her separate use—(note to 3 Brown's Chy. Rep. p. 318.)

In five subsequent cases in the English Courts, the same doctrine has been held. Wills v. Sayer, 4 Mad. 409; Roberts v. Spicer, 5 Mad. 491. In the case of Kensington v. Holland, it is said "a gift to a wife 'for her own use and benefit' does not clearly express such intention, nor to a husband for a wife's own use and benefit." 2 Myl. & Keen, 184.

In Tilor v. Lake, the words "to be paid 'into her own proper hands for her own use and benefit,' were held insufficient." 4 Simons, 144. So as also "the words 'to her own proper use and benefit,' were held insufficient." 2 Hare, 49.

It is not pretended that the word "behoof" in this deed adds any thing to the other words. It seems to be equivalent to "benefit" in the cases cited.

In Alabama, it has been held that the "words 'to the use and *behoof* of the wife' and 'to have the use and benefit of the labor and services of the said slaves and all the proceeds thereof during her life,' do not create a separate estate." Scott v. Abercrombie, 14 Ala. 270—803.

Abundant other cases to the same effect will be found in the American Courts, but it is unnecessary to extend them.

It is said that the authorities "afford but an uncertain"

light to guide the footsteps of the enquirer after truth, and we are remitted to the application of elementary principles " as the only unerring guide to correct conclusions."

How the inference is attained that there is an uncertain light on this subject, it is difficult to understand. The eight cases referred to above are directly in point, and have not been overruled. If they are, it has not been shown to the court, nor have we been able to find any such in our extended examination and research. So far from it, the text books in England speak of the law as settled, thus— " expressions which have been held insufficient to raise a trust for the wife's separate estate are ' to be paid to her and for her use,' 'to her own use and benefit.' " 2 Roper, Husband and Wife, 164.

" However the intention to create a separate estate must be clearly and unequivocally expressed in order to deprive the husband of his marital rights. Thus it has been held that a simple trust ' for her own use and benefit' will not create a trust for her separate use," quoting Wills v. Sayers, Roberts v. Spicer, Kensington v. Holland, Byles v. Spencer, &c., Hill on Trustees, 420.

" Legacies to married women ' for their own use and benefit,' have been held not to be separate property." 2 Bright, Hus. and wife, 208; so also Clancey, 267.

In justice Story's great work on Equity Jurisprudence, we find language to this effect : " Under what circumstances property given, secured, or bequeathed to the wife shall be deemed a trust for her separate and exclusive use, is a matter which, upon the authorities, involve *some nice distinctions*." After enumerating on the one hand the words and language that will exclude the marital rights and create a separate estate, he says, " on the other hand, a gift or bequest after marriage to a married woman, ' for

her own use and benefit,' has been held not to amount to a sufficient expression." 2 Story Eq. 610.

Chancellor Kent, in his Commentaries, makes no objection to the rules thus laid down, although he is vehement on the subject of the *right of disposition* of the *feme* in her separate estate, evidently preferring his own views to those of the court of New York in the case of Jacques v. The Methodist Ep. Church, 17 John. Rep. 548, in which he was overruled.

In a recent American work of merit, the general rule of the English Courts on the subject is given without dissent, and with a distinct reference to the cases quoted above of Tilor v. Lake, &c. 4 Bouvier Institutes, 274.

So that in reference to the words of this instrument, there is not only no uncertain light, but a remarkable clearness and certainty. So far from uncertainty, there is entire unanimity, full harmony and accord of opinion. And when it is remembered that these decisions were given by the Court of Chancery in England in its highest estate, composed of the first intellects, men renowned for their integrity, to which is to be added the concurrence of our own judges, jurists and lawyers of highest intelligence, standing and character, there will be found no little hazard in the assertion that there is uncertainty. If eight decisions on the very question, without a single one overrulling or in opposition, with the full concurrence of the American Courts and elementary writers, both in this country and England, will not settle a point, will produce uncertainty, what is to be regarded as adequate to effect certainty and to remove doubts?

This uncertainty, it is said, makes it necessary to resort to *elementary principles*, and that these give a separate estate to the wife. They will be found to be to this effect: " By marriage the husband and wife are as one person in

law. The very being or legal existence of the woman was by the ancient common-law suspended during the continuance of marriage, which gives an absolute right to the husband in all his wife's chattels, personal in possession, a qualified right to her choses in action, and a conditional right to chattels real, if he survive her, irrespective of his right to alien them at his pleasure during her life-time. The husband becomes liable for all debts and obligations of his wife incurred before the coverture. The reasons upon which the law virtually suspends the existence of the woman during coverture, appear to be those first for her husband's safety in depriving her of the power to injure him by any act, without his concurrence or his assent, either expressed or implied, and secondly for her own security in guarding against the husband's influence over her, by disabling her from disposing of her own property, except by those methods and with the solemnities which the law itself prescribed." 1 Ropers, Husband and wife, p. 1.

" It is well known that the strict rules of the old common law would not permit the wife to take or enjoy any real or personal estate, separate from or independent from her husband." 2 Story's Eq. 606.

Such were the elementary principles governing this relation and the property belonging to or conveyed to the wife, when the Courts of Equity in the beginning of the last century recognized a separate interest and estate in her. They did it with a declaration, and using language of this character—" Courts of Equity will not deprive the husband of his wife's property, to which he is by law entitled, unless the intention be clear that he is not to derive any benefit from it, and that it shall be for the personal use and disposition of the wife." 2 Bright, Husband and wife, 206.

" The purpose must clearly appear, beyond any reasonable doubt, otherwise the husband will retain his ordinary legal and marital rights over it." 2 Story's Eq. 608.

" Such a claim on the part of a married woman being against common right, the instrument under which it is made must clearly speak the donor's intention to bar the husband, else it cannot be allowed. It will appear from the cases that the strongest evidence of intended generosity and of bounty towards the wife will not be sufficient to give her a separate estate, unless in addition language be used by the donor clearly expressing the exclusion of the husband, or else directions be given with respect to the enjoyment of the gift wholly incompatible with any dominion of the husband." Clancey, 262.

" The intention to create a separate estate must be clearly and unequivocally expressed, in order to deprive the husband of his marital rights. And in modern times, judges have required much more stringent expressions for this purpose, than were once considered sufficient." Hill on Trustees, 420.

The decisions in South Carolina are accordant with these views. " The bequest is to her. This gives an absolute estate in personal property, and she would have the absolute right to dispose of it during her life, or at her death, unless she were a married woman and and thus disquali by law from exercising acts of ownership over it, in which case her being and her rights are blended with her husband's. The addition of the words (at her disposal at her death,) do not of themselves add to or enlarge her interest in or power over the property previously bequeathed to her. If it had been intended to give her a sole and separate estate, free from the control of her husband, not subject to his debts, and subject to her disposition by deed or will, it would have been easy to have made such provision, and

the law is so desirous to extend to the citizens the right of disposing of their property, according to their affections, wishes and even caprices, that it will recognize and give effect to such departure from the general rule. It does, however, require that the expression of such intent should be plain, explicit and unequivocal, else there will be a continual conflict from the desire to raise up implication of an intention to give a sole and separate estate to the wife from slight expressions, leading to unceasing litigation." This was a bequest to a wife of personal property to her, and at her disposal at her death, and was held not to exclude the marital rights. Graham v. Graham's Exrs. 143.

The elementary principles appealed to, plainly and manifestly in this case give the property to the husband; for if the intent be not plain, explicit and unequivocal, if there be " an uncertain light " as to the meaning of the words and language of the instrument, then, by the elementary principles prevailing, as well at law as in equity, the separate estate is not created, but the property is subject to the marital rights.

Again, it is urged that " intention, relation of the parties and the context, exercise an important relation," and it is argued that the fact of "this lady's being a married woman when the gift was made, is a circumstance from which the intent should be inferred." The opposite of this is clearly shown by the authorities already adduced, but more clearly in the decision made at a very early period, in which " H. B. bequeathed £100 to the plaintiff's wife, to be paid within six months after the testator's death, and a bill being filed by the husband for this legacy against the executor, his defence was that he had paid the wife and had her receipt for the money, and it was argued for the defendant, the executor, that it must have been the intention of the testator to have bequeathed this sum for the separate

maintenance of the wife, for that at the time of making the
will the plaintiff and wife lived separately, and that she
was much straightened in her circumstances, which was
known to the testator.   However, the Lord Keeper held it
to be no good payment."—1 Raith. Vern., 261; Clancey,
262.

If our own opinions were less fixed on the subject, we
should feel great reluctance in disturbing a rule of pro-
perty prevailing so long and with such universal accep-
tance and approval.    It is nearly a century since the
first decision was made.   Since then there is not one, but
"many decisions," "successive determinations," a "long
series of authority " " and a train of decisions," all accord-
ing, none opposing—not a dissent—so that there is no
longer pretext for calling the principle in question.  " *Res
adjudicata stare decisis*, is a first principle in the admin-
istration of justice—it is one of the most sacred in law."
" Whatever the private opinion of a judge may be, it is
safer to conform to established decisions, particularly in
the House of Lords, but if not, the errors of great judges,
acquiesced in for a series of years, ought to be adhered to.
If mischief appear, the *Legislature* may *interfere, but it is
too much for the Courts*.   Upon the faith of an established
rule and the acquiescence of judges and of the whole na-
tion in it, property to the amount of millions may de-
pend."—Ram on Legal Judgments, 26–27.

"Every innovation occasions more harm and derange-
ment of order, by its very novelty, than benefit by its ac-
tual utility.   It is an established rule to abide by *former
precedents*, *stare decisis*, where the same points come
again in litigation, as well to keep the scale of justice
even and steady, and not liable to waver with every new
judge's opinion, as also because the law in that case being
solemnly declared and determined, what before was un-

certain and perhaps indifferent is now become a perma-
nent rule, which it is not in the breast of any subsequent
judge to alter or vary from, according to his private senti-
ments, he being *sworn* to determine, not according to his
own private judgment, but according to the known laws
and customs of the land—not delegated to pronounce a
new law, but to maintain and expound the old one. *Jus
dicere et non jus dare.*"—1 Blackstone Com., 69.

"Where a rule has become settled law, it is to be fol-
lowed, although some possible inconvenience may grow
from a strict observance of it, or although a satisfac-
tory reason for it is wanted, or the principle and policy of
the rule may be questioned. If there is a general hard-
ship affecting a general class of cases, it is a consideration
for the *Legislature, not for a Court of Justice.* If there is
a particular hardship from the particular circumstances of
the case, nothing can be more *dangerous* or *mischievous*
than upon those particular circumstances to deviate from
a general rule of law, for *misera est servitus ubi jus est
vagum aut incertum.*"

"Obedience to law becomes a hardship when the law is
unsettled or doubtful, which maxim applies with peculiar
force to questions respecting real property, as family set-
tlements, &c., and if in consequence of new lights occur-
ring to new judges, all that which was supposed to be law
by the wisdom of our ancestors were to be swept away at
the time particular limitations are to take effect, mischie-
vous would be the consequences to the public."—Wine-
hous vs. Rennol, 8 Bing., 557; 2 Vesey, Jr., 426–'7; Clark
vs. Ludlum, 2 Bing, 180; 8th T. R., 504; Broom's Legal
Maxims, 61.

"The doctrine of the law then, is this : that precedent's
and rules must be followed unless flatly absured or un-
just ; for though their reason be not obvious at first view,

yet we owe such a deference to former times as not to suppose that they acted wholly without consideration. To illustrate this doctrine by examples. It has been determined time out of mind, that a brother of the half blood shall never succeed as heir to the estate of his half brother, but it shall rather escheat to the King or other superior Lord. Now this is a positive law, fixed and established by custom, which custom is evidenced by judicial decisions, and therefore can never be departed from by any modern judge without a breach of his oath and the law ; for herein there is nothing repugnant to natural justice, though the artificial reason of it, drawn from the feudal law, may not be quite obvious to every body, and therefore though a modern judge, on account of a supposed hardship upon the half brother, might wish it had been otherwise settled, yet it is *not in his power to alter it.*" 1 Black. Com. 70.

The American Courts are by no means in conflict with the English on this subject.

"When a rule of property has been settled by judicial decisions, and may reasonably be supposed to have entered into the business transactions of the country, it is the duty of the Courts to adhere to it and leave the corrective to the Legislature." Macvay v. Ijams, 27 Ala., 238.

" The rule of *stare decisis* should not be departed from, except on the fullest conviction that the law has been settled wrong." 11 Texas, 449.

" A rule which has become settled law is binding on the Courts and should be followed." 25 Ala. 201.

"It is not so important that the law should be rightly settled as that it should remain stable after it is settled." 7 Monroe, 62–3.

" It is the duty of the judiciary, and they have the power to carry into effect the rights of parties according to ex-

Tison vs. Mattair.—Dissenting Opinion.

isting law, not to make a law for each case." 9 B. Monroe, 302.

The married woman's law does not affect the rights of these parties. The husband's right having vested in 1840, it could not be divested by a law passed afterwards in 1845. This law was prospective, and not intended to embrace property which had already passed to the husband.—(See Thompson's Dig. 221.)

We are of opinion then that the right of property in the slave Primus, the subject of this contest, was in Henry Mattair, and not in his wife, and that her claim to him is not sustained.

The judgment of the Circuit Court will be reversed and set aside, and the cause remanded to that Court with directions to enter judgment dismissing the claim of Mrs. Mattair, so as to leave the property subject to her husband's debts.

DuPONT, J., delivered the following dissenting opinion:

I do not concur in the judgment of the Court, and will now proceed to give my views upon the subject.

This was a suit arising out of a levy upon a slave, claimed by a *feme covert* as her separate property.

On the trial of the claim, before the Court, (a jury having been waived by consent of parties,) the plaintiff in excution produced the record of a judgment recovered against the husband of the claimant, in the Circuit Court of Columbia County, on the 20th day of December, 1855, together with the *fi. fa.* issued thereon, on the 31st day of January, 1856. He also proved that Henry Mattair, the defendant in execution and the husband of the claimant, had been in

possession of the slave, from the year 1840 or 1841, down to the date of the levy.

The claimant adduced in evidence a deed of gift from her father, Henry Jones, dated the 3rd day of November, 1840, purporting to convey the said slave "to Caroline Mattair, wife of Henry Mattair, and the heirs of her body," with *habendum* to " the said Caroline Mattair and her immediate offspring—*to their own proper use and behoof forever.*" It further appeared in evidence that the deed produced on the trial was a copy of the original which had been properly recorded, but which, together with the record of the same, had been destroyed in the fire which consumed the records and papers belonging to the clerk's office of Columbia county. This established copy was also recorded on the 2nd day of February, 1848. It was also in evidence that the debt upon which the judgment was founded, consisted of two promissory notes of the said defendant in execution—the one dated on the 29th of January, 1853, and the other on the 20th of March, 1854. It further appeared that at the time that these notes were given, the plaintiff in execution had full notice of the existence of the deed of gift, and that it had been recorded.

The Court gave judgment for the claimant, and from that judgment an appeal has been taken to this Court.

At the hearing before us, the counsel on both sides argued the cause, as though it were to be governed by the provisions of the statute known as "the married woman's law."

For the plaintiff in execution, it was insisted that the act referred to could not be made to operate retroactively, and the property having been acquired anterior to the passage of the act, it was not protected by its provisions, unless by the terms of the deed it had been secured to the wife as *separate property.*

Tison vs. Mattair.—Dissenting Opinion.

For the claimant, it was contended, that although the terms of the deed should not be found to convey a *separate estate* to the wife, yet, inasmuch as the possession of the husband was only the possession of the wife, and he had never exercised any act of ownership over the property inconsistent with the title of the wife, or attempted to deal with the same as his own; and, inasmuch as the credit extended to the husband transpired subsequent to the passage of the act, the provisions of the same operated to secure the property to the wife immediately from the date of the enactment. I do not concur in this position; for, if the slave was not the *separate property* of the wife at the time of its acquisition and before the passage of the act, there is nothing in its provisions which will give it a retroactive operation, and even if there were, I doubt whether such a provision could be enforced without an infraction of the Constitution. My opinion is, that the case must be decided upon common law principles and without any reference to our statute. The simple question, then, presented for consideration is, did the terms of the deed secure to the wife a *separate estate* in the slave? The words of conveyance in this deed are, "to Caroline Mattair, wife of Henry Mattair, and the heirs of her body." These words, when applied to *personalty*, it is well settled, convey an *absolute* title to the grantee or first taker. The words of the *habendum* are, "to the said Caroline Mattair and her immediate offspring—*to their own proper use and behoof forever.*" It is upon the effect to be given to these latter words that this case is to be decided.

Upon proceeding in this investigation, it is painful to discover in the adjudicated cases the extraordinary conflict which prevails upon the subject. In the English cases, of equal character and authority, the same identical

words are interpreted to signify a diametrically opposite
meaning. While one authority will hold the particular
words to secure a separate estate to the wife, another
will hold the same words to convey the estate to the hus-
band.

It has been held that the words " for her own use and at
her own disposal," created a separate estate for the wife,
and barred the marital rights of the husband.—(Prichard
vs. Ames, 1 Turn. & Russ., 222; Inglefield vs. Coghlan, 2
Coll., 247.) So also the words, " for her own use and bene-
fit, independent of any other person."—(Margetts vs. Bar-
renger, 7 Sim., 482.) So too the words " for her liveli-
hood," (Darly vs. Darly, 3 Atkins, 399,) or " that she
should receive and enjoy the issue and profits."—(Tyrell
vs. Hope, 2 Atkins, 558.) So where the direction is that
" the interest and profits be paid to her, and the principal
to her, or to her order, by note in writing under her
hand;"—(Hulmne vs. Terrant, 1 Bro. C. C., 16;) or "her
receipt to be a sufficient discharge;"—(Lee vs. Prieaux, 3
Bro. C. C., 381;) or " to be delivered to her on demand."
(Dixon vs. Olmins, 2 Cox, 414.)

On the other hand, it has been held that the words " to
pay to her (a married woman) and her assigns," do not
create a separate use for the wife.—(Dakins vs. Berrisford,.
1 Ch. C., 194;) or where the gift is " to her use;—(Jacobs
vs. Amyatt, 1 Mad., 379;) or "to her own use and bene-
fit;"—(Johnes vs. Lockhart, cited 3 Bro. C. C., 383;) or
" to her absolute use;"—(ex parte Abbott, 1 Deac., 338;)
or when the payment is directed to be made " into her
own proper hands, to and for her own use and benefit;"—
(Tyler vs. Lake, 4 Sim., 144;) or "to her own proper use
and benefit;"—(Blacklow vs. Laws, 2 Hare, 49;) or when
the property is " to be under her sole control;"—(Massy
vs. Parker, 2 My. & Keene, 674.) So also a bequest to a

woman and her assigns for her life, "for her and their own absolute use and benefit," has been held not to confer upon her a separate estate.

The foregoing citations are taken from the English reports, but, so far as I have had access to the American adjudications, I doubt if they will be found to afford any clearer light upon the subject. By a critical comparison of the words and their import which have been held to create a separate estate, and those which have been held not to do so, it will be seen that where there have been no terms which expressly excluded the marital rights of the husband, the decision in the particular case has been purely arbitrary, and not conformable to any well-defined rule of interpretation. This being the case, they afford but an uncertain light to guide the footsteps of the enquirer after truth, and we are remitted at last to the application of elementary principles, the only unerring guide to correct conclusions.

It is well settled, that no particular form of words is necessary in order to vest property in a married woman to her separate use; but the intention to give her such an interest, in opposition to the legal rights of her husband, must be clear and unequivocal. On the other hand, whenever it appears, either from the nature of the transaction, as in the instance of a settlement in the contemplation of marriage, where the husband is a party, or from the whole context of the instrument, limiting to the wife the property, that she was intended to have it to her sole use, that intention will be carried into effect by a court of equity.— 2 Bright's Husband and Wife, 210; Leading Cases in Equity, 366.

It will thus be seen that the question is made to turn entirely on *intention*, and that where resort is to be had to implication, in order to ascertain that intention, the na-

*ture* of the transaction, the *relation* of the parties and the *context* of the instrument, will exercise an important bearing upon the question. To my mind, these circumstances are well entitled to be received as *indicia* of intention, and are of greater weight than any loose form of words, which have no technical or fixed signification. With reference to the *nature* of the transaction, we can well conceive that where the deed is made to a *feme* in contemplation of an immediate marriage, the intention to secure to her a separate estate would be much more apparent than if it were made under ordinary circumstances. So, too, in respect to the *relation* of the parties : if the gift were from the husband, or he were a party to the deed, the presumption would be very strong that a separate estate were intended to be secured to the wife; for, to what purpose would he give the property, or become a party to the instrument, unless with the intention to bar his marital rights? So also with respect to the context, where different expressions occur in the deed, it will not be inferred that it was the intention of the donor to apply one and the same meaning to the different expressions. This is illustrated by the decision in the case of Kensington v. Holland (2 Mylne & Keene, 184.) In that case, there was a settlement upon Harriet Elizabeth O'Harra for, and during her life, " to and for her own sole and separate use, *independent of, and without being subject to the control, debts or engagements of her husband.*" In the same deed the remainder, after the expiration of the life estate, was settled upon Maria Theresa Holland, wife of Francis Holland, her executors, administrators and assigns, " *to and for her and their own use and benefit.*" A bill was filed by the assignee of the husband, to subject this remainder interest to the payment of his debts, and it was contended in behalf of the wife, that it was her separate estate under

the operation of the words, " to and for her and their own use and benefit." The Master of the Rolls decided against her claim, and in his opinion delivered in the case said : " The intention to give a separate estate must be clearly expressed. A gift to a wife for her own use and benefit, does not clearly express such an intention ; *more especially* when it is considered, that in this case a trust for the separate use of a married woman is clearly expressed in the preceding part of the settlement. The court cannot infer that the same effect was intended to be given to different expressions."

The case of Tyler v. Lake, (4 Sim. 144,) furnishes another authority for resorting to the context of the deed in order to determine the intention of the donor, where the expressions used in the instrument are ambiguous. By a deed declaring the trusts of the proceeds of real estates, the share of a married daughter of the grantor was directed " to be paid into her proper hands for her own use and benefit ;" and the same words were used in declaring the trusts of the shares of the grantor's sons. In commenting upon the case, the Vice Chancellor observed—" Supposing that it were ambiguous in this case, what is the meaning of the words relied on ? The will itself has given us a power of construing them ; for it must be supposed that the settlor intended the same in one gift as in the other. Now in the gift to William Tyler, the settlor has used the same words as in the gift to Mrs. Anthony, but it cannot be supposed that she intended, by using those words, to give him any peculiar power, over the property which he was to take, except what is implied in the gift, and therefore I am bound to say that in the gift to Mrs. Anthony, those words are to be taken as mere words of gift, and not as conferring on her any peculiar power over the property."

These cases abundantly illustrate the correctness of my position, that where the words in the deed are ambiguous, resort may legitimately be had to the circumstances arising out of the nature of the transaction, the relation of the parties, and the context of the instrument, as *indicia* of the intention.   In other words, that each case must furnish its own lights, and that we are to be guided to a conclusion rather by those lights than by the *arbitrary rulings* upon particular words, which have been made regardless of the surrounding circumstances.

Applying these views to the deed under consideration, and trying it by the tests above indicated, and I think there can be but little doubt as to the *intention* of the donor, when he used the words—" to their own proper use and behoof forever."

If we refer to the *nature of the transaction*, it will be found that this was a gift to a woman, who was at the time under the *disability of coverture*.   If it were not the intention of the donor to give her a separate estate in the property, and to bar the marital rights of the husband, why was the deed made to her?   We certainly cannot impute to the donor an ignorance of the fact, that, at common law, personal property given to the wife inures absolutely to the husband.   There must have been some object contemplated in making the wife the donee in the deed.   I do not insist that this circumstance taken alone, is sufficient to fix an intention to create a separate estate, but I enumerate it as only one of the *indicia* of such an intention.

And as to *the relation of the parties:*—This is not an ordinary purchase by the wife for value; but it is a voluntary gift from a parent to a married daughter, founded upon the consideration of " natural love and affection." The object doubtless, in making the deed to her, was *to* provide for the comfortable support and maintenance of

her and her children, and to guard against the casualties
which might befall the husband's fortune.  This view of
the case is in accordance with the tender regard which
every parent must be supposed to entertain for the welfare
of his offspring.  But neither do I consider this circum-
stance, isolated and alone, as sufficient to bar the marital
rights of the husband.  It is only mentioned as one of the
guides to the intention.

Upon the next circumstance, however, to wit: *the con-
text* of the deed, I do lay great stress, and I think it suffi-
ciently potent of itself to fix the true signification and
meaning of the words, " to their own proper use and be-
hoof forever."

By reference to the deed it will be seen that the proper-
ty was conveyed to her, *" and the heirs of her body."*
Now there must have been some object contemplated by
the donor in thus attempting to limit the property " to the
heirs of her body."  That object evidently was to give the
wife a life estate, with remainder over to her children, and
thus to bar the estate of the husband.  It is true that from
ignorance of a well established rule of law, that object of
the donor was frustrated ; but the failure to effectuate the
object by no means lessens the potency of the words, when
considered as a means of interpreting the true meaning of
the deed.  In this connection, the words are to be consid-
ered, not with reference to their legal effect, but only as
*indicia* of the intention.  If there be any force in this view
of the matter, then is it greatly strengthened by the fact,
that the same effort to limit the estate is repeated in the
*habendum* clause of the deed, where the words used are
" to her and to her immediate offspring."

After the most anxious deliberation upon this subject,
and with an earnest desire to concur with the views of my
brethren if possible, I am constrained to hold that the deed

in question does secure to Mrs. Mattair a *separate estate* in the slave levied upon, and that he is not subject to the debts of the husband. I therefore *dissent* from the judgment of reversal, pronounced by this court.