## NOLES *vs.* THE STATE.

1. To excuse a homicide, there must exist on the part of the slayer an actual necessity to kill in order to prevent the commission of a felony or great bodily harm, or a reasonable belief in his mind that such necessity exists.
2. While every citizen has the right to resist any attempt to put an illegal restraint upon his liberty, his resistance must not be in enormous disproportion to the injury threatened. He has no right to kill, to prevent a mere trespass which is unaccompanied by any imminent danger of great bodily harm or felony, and which does not produce in his mind a reasonable belief of such danger.
3. The charges of the court in this case, and its refusal to give the charges asked by the prisoner, tested by these principles, and held correct.
4. Any fact which tends to prove the real motive of the prisoner in killing the deceased, or the purpose of the deceased in going to the prisoner's house, or that the prisoner knew, at the time of the killing, that the deceased and his companions did not intend to commit any felony, nor to do him any great bodily harm, is relevant evidence.

5. A verdict, finding the prisoner "guilty of murder in the first degree, and penitentiary for life," is sufficient to support a judgment of conviction and sentence of confinement in the penitentiary for life.

ERROR·from the Circuit Court of Dallas.

Tried before the Hon. NAT. COOK.

JOSEPH NOLES was indicted, at the Spring term, 1853, for the murder of one George T. Sharp ; was tried, and convicted, and sentenced to be hung, but the judgment was reversed at the June term, 1854, of the Supreme Court, and the cause remanded.—See 24 Ala. 672. A second trial was had at the Fall term, 1854, which resulted in another conviction, from which this writ of error is prosecuted.

The bill of exceptions sets out all the evidence, which, with such alterations as are necessary to make it intelligible in print, is as follows :

"James H. Burns, who was the first witness sworn, said, he was an acting justice of the peace in the beat where the prisoner lived, at and before the time, and when the murder was charged to have been committed. Here an affidavit, made before Burns by the wife of the prisoner, and a warrant issued by Burns, were offered by the State, and objected to by the prisoner ; which objection was sustained by the court, and both the affidavit and warrant excluded from the jury. The State then offered to prove the fact that the prisoner's wife had made an affidavit against him, and that this fact was communicated to the prisoner ; which was objected to by the prisoner, but his objection was overruled, and he excepted. Burns then testified, that Mrs. Noles had made an affidavit before him ; that he read the affidavit to the prisoner, who demanded an investigation ; that he told the prisoner he had no constable or officer to arrest him, and that he would not try him unless he was regularly arrested, but, if he would surrender himself to some one, he (Burns) would appoint such person constable and investigate it ; that Noles replied, he would see about it, and then left ; that this was on the morning of the day Sharp was killed. The prisoner again objected to this evidence, and moved to exclude it ; but the court overruled the objection, and the prisoner excepted. Burns also testified, that both Sharp and Noles were in the village of

Burnsville on that day ; that Sharp at first refused, but, after being pressed, agreed to go and arrest Noles ; that he authorized him to go by appointing him special constable, there being none in the beat; that he gave him the paper he had issued, and Sharp said that he would go. The prisoner objected to so much of what this witness said, saying that he gave Sharp authority to go, and that he gave Sharp the paper he had issued ; but the court overruled the objection, and the prisoner excepted. Burns said, this was after Noles had talked with him, and that Noles was not present ; that Sharp went off towards Noles's house ; that this was in the morning of the day on which Sharp was killed ; that Sharp consented at the solicitation of others. He said, a young man named Cole, then a clerk in his store in Burnsville, had a double-barreled gun in the store, which the young men sometimes hunted with, and which was kept loaded at night ; that this young man (Cole) was now dead ; that he (Burns) did not see the party when they started to go to Noles's house, nor did he examine the gun after the killing of Sharp, nor did he know that this was the gun Sharp had at the time he was killed.

"Lewis Kirkland testified, that he was in Burnsville on the day Sharp was killed ; that Noles, in the morning of that day, was in Burnsville, and had a quarrel or difficulty with a man by the name of Perry, in the house of Mrs. Kelly ; that Mrs. Kelly requested Sharp to take Noles out of her house ; that Sharp went into the house, and talked with Noles, and they came out in a friendly manner ; that Noles then went off towards home ; that shortly after this Sharp summoned witness, with six or seven other persons, to go and arrest Noles, who lived some short distance from Burnsville ; that when Sharp and his company got within forty or fifty yards of Noles's house, Noles came out into the yard, with his gun in his hand, and ordered Sharp and his party to stand off; that he said, if we abused him, he would shoot some of us ; he said to them, ' they were a drunken, rowdy set, and if they would go away and send some old men, he would go with them, or, if they would send a ten-year-old boy, he would go with him.' This witness said, he had not been drinking, *but that Perry had, but was not drunk, and none were, and was the man Noles had quarreled with that morning in Burnsville* (?) that neither Sharp,

3

nor his company, had any gun or other arms that he saw or knew of; that when Noles ordered them to stop, they did so; that Sharp told Noles not to shoot, that they would not rush upon him, but that he would return in the evening and arrest him; that Noles replied, he would be at home; that Sharp and his party then left; that they were all peaceable and quiet men, and none of them drunk. He further testified that Sharp and his company returned to Burnsville, and Sharp then got a double-barreled gun, but (witness?) did not know where he got it from; that Sharp summoned Wm. B. Hall and a man named Coxe (these men were older than the others were) to return to Noles's house, for the purpose of arresting Noles; that the gun was given to witness, which he carried until they got in sight of Noles's house, when he gave it to Sharp; that the company rode on, Hall and Coxe in front some thirty or forty yards ahead of Sharp; that witness was behind Sharp, some ten or fifteen yards off, on his left; that Noles came out into the yard; that he then had his gun in his hand, and ordered the company to stop, raising his gun to his face, and saying, if they advanced, he would shoot some of them; that he only heard one command to stop; that they all stopped, and Sharp, who was then sixty or seventy yards off, stopped, and dismounted quickly on the left side of his horse, holding the gun in an elevated position in his left hand about the middle of the gun, and the bridle in his right hand; that Sharp's horse pulled back; that he saw the gun of Noles waive, as if directed from Hall and Coxe, who were on the left of Sharp, so as to bear on Sharp; that he kept his eye on Sharp, expecting him to shoot, as he had the warrant and gun; that as soon Sharp was on the ground, and fairly erect, Noles's gun fired; that Sharp did not present his gun to shoot, as he saw; that he could have shot very quick, if Noles had not shot him first—that he only had to bring his right hand to the gun, and he would be ready to shoot; that he heard but one report; that he did not examine Sharp's gun, nor did he know whether it was loaded, although he carried it a part of the way; that Sharp lived about ten minutes after he was shot; that Noles fled.

"Wm. B. Hall went to Burnsville on the day Sharp was killed, and between 2 and 4 o'clock of that day Sharp sum-

moned him to go and aid in arresting Noles; that he went, and several other persons also went; that Sharp had a double-barreled gun with him; that witness and a man by the name of Coxe were riding together, in advance of Sharp and the balance of the company some twenty or thirty yards; that when he first saw Noles, he had his gun in his hand, and ordered the company to stop; he said he would not be intruded on, and if they did not stop he would shoot; that Sharp and the company behind stopped, but witness and Coxe did not, but advanced, and witness saw from 'the cut of Noles's eye' he was about to shoot, and attempted to throw himself from his horse in such a way as to avoid being shot; that he called out, 'He is about to shoot,' or 'We are about to catch it'; that Sharp was behind him some distance, and at this time he did not see him, but he saw Noles move his gun quickly, and the gun fired, and Sharp was killed; that Noles fled, and he pursued him some distance, but did not overtake him; that he heard but one report; that the company went up to Noles's house in a peaceable and quiet manner—did not attempt any personal violence on Noles; does not remember saying, 'Shoot, he is going to shoot us'; he had no arms with him.

" C. R. Coxe testified, that he was summoned by Sharp, in the afternoon of the day on which Sharp was killed, to go and aid in arresting Noles; Sharp had a gun, and witness had a pistol in his pocket, but did not draw it; witness and Wm. B. Hall went together, and in advance of Sharp and the rest of the company some thirty or forty yards; when they had got within some twenty or thirty yards of the house, he saw Noles as if he came around one corner of the house; that he did not then have his gun in his hand, and he forbid the approach of the persons any further, saying that he would not be intruded upon; Sharp, and the party behind witness and Hall, stopped; Hall said to witness, 'Let us go on'; they did so, when Noles stepped to the corner of the house he had come around, and took up his gun, and ordering them again to stop, and saying, if they did not he would shoot them; the gun was then presented, when Hall immediately made an effort to get from his horse, and cried out, 'Shoot him, he's going to shoot us'; at this moment Noles passed his gun from witness and Hall towards Sharp, and very quick the gun fired; witness said he

distinguished two reports, but he thought one at the time, and still thinks that the report was from the echo at the house; after the shooting he found Sharp's gun on the ground, near where he was shot, the right hammer down, and the cap was either burst or off; he did not examine otherwise whether the gun was loaded.

"F. Carson was present in the morning when the company first went to arrest Noles; he forbid their approach, and said, that they were a drunken set, and he would not be intruded on; when ordered to stop, they did so, forty or fifty yards off; Sharp said, he would not arrest him then, but would return in the evening and do so; Noles said, ' You will find me here '; the party had no gun, or other arms,—they were peaceable and quiet,—were not drunk; they all went back to Burnsville, and Sharp got a gun, and summoned some more men, (Hall and Coxe,) and when they came in sight of the house witness and several others were behind Sharp ten or fifteen yards, and were off to his right; Hall and Coxe were some distance before; the first witness saw, Noles was in the yard, with his gun, and ordered the party to stop, and said, if they rushed on him he would shoot some of them; his gun was pointed at Hall and Coxe; Sharp, who was then on his horse, got down quick, and Noles then waived his gun from Hall and Coxe to Sharp; this was not until Sharp had got down, or had started to get down from his horse, and the gun did not fire until Sharp was fairly on his feet; witness did not hear any one say, ' Shoot him '; he was behind Sharp, who had let his horse go before he was shot; he only heard one report.

"Mr. Lassiter was with the party in the morning, and proved about the same as the other witnesses; was present, also, when Sharp was killed; the first he saw of Noles, he was in the yard, with his gun in his hand presented; he said, ' Stop, or I will shoot ',—he would not be rushed on, and the gun fired nearly as soon as the words were out of his mouth; he did not hear any body say, ' Shoot '; the gun was not pointed at Sharp until he got down, and when he got down he had his gun in his left hand; witness was behind Sharp some thirty paces; Sharp had let his horse go, with the bridle reins over his neck, before he was shot, and was on the ground when he was shot; witness heard but one report.

"Dr. Gee examined the wounds of the deceased; his death was produced from the wounds he examined; they were in the left side; there were two wounds on his left arm, both inflicted by one shot,—where the shot entered, and where it passed out, making two wounds; this wound was about two or two-and-a-half inches below the point of the shoulder where it passed out; where this shot entered the arm it must have broken the bone, if the arm had been down; it could only have taken the direction it did when the arm was raised. Dr. Gee's opinion was, that this arm was raised level when this shot struck it; that it passed up the arm, and went out at the point of the shoulder.

"Mr. McCain was not present at the shooting; followed the prisoner into the State of Georgia, where he arrested him, and brought him back to Alabama. B. T. Sharp was brother to the deceased; saw Noles when he shot; was one hundred and fifty yards off still, behind all the company; thinks his brother's gun did not fire; the horse deceased rode was a very wild horse, and deceased knew he could not shoot off of him. This was all the evidence given by the State. It was then admitted by the State, that Mrs. Barrett, if present, would prove that she heard two distinct reports of guns, in quick succession, between a quarter and a half-mile from the place, and at the time Sharp was killed. West proved, also, that Hall, one of the witnesses for the State, told him that, when they went to Noles's, they did not want to take him, but wanted him to go away.

"His Honor, among other things, charged the jury:

"1. That Sharp and his party, in going to the house of Noles to arrest him, not having any warrant to do so, and no charge of felony against him, were all trespassers; and that the prisoner had the right so to consider them, and to treat them as such.

"2. But, notwithstanding this, if neither Sharp, nor his company, intended to commit any felony against Noles, (as by killing him, or doing him great bodily harm, stealing his goods, or burning his house, or the like,) and that neither Sharp, nor any of his company, said or did anything which might induce Noles to apprehend that they intended to commit a felony, or such things as are above referred to,—then

Noles could not justify killing Sharp, but would be guilty at least of manslaughter, and of murder if the killing was of malice, as the court will hereafter explain.

" 3. That the law regarded the liberty of the citizen as sacred, and every arrest of a citizen without warrant (where no felony actually committed was charged, and where the arrest was not to prevent the commission of a felony) was a trespass, and such arrest was unlawful ; that such unlawful arrest was, in law, a great provocation, sufficient to excite and heat the blood of the party arrested ; and that, if, under such heat and excitement, the party about to be arrested, to prevent it, kills the trespasser,—it would be only manslaughter.

" 4. But, if in this particular case the prisoner knew and believed that Sharp and his party only intended to arrest him, and carry him before Esquire Burns, to answer the complaint to keep the peace, and to prevent this he killed Sharp, with what the law calls malice, as already explained to the jury,—then he would be guilty of murder, *notwithstanding the unlawfulness of the arresting so intending to carrying him before Justice Burns.*

"The prisoner excepted to the charge of the court, and wrote out and asked the following charges :

" 1. If the deceased and his company went to the prisoner's house in order to arrest him, having no warrant or authority to do so, then they were all trespassers, and the prisoner was not bound to submit to their arrest, and, in forbidding their approach, he did no more than he had a right to do ; and if the company, or any of them, refused to stop, but still advanced, intending to arrest him, and he could only prevent the arrest by taking up and presenting his gun at the parties so advancing, he had the right to do so ; and if, when he so presented his gun, still forbidding their approach, one of the party called out to Sharp to shoot the prisoner,—if Sharp had a gun, and dismounted immediately, and did then any act or acts calculated reasonably to satisfy the prisoner that he was then in danger of being immediately shot by Sharp,—then it was lawful for the prisoner to shoot, and if he killed Sharp, it was neither murder nor manslaughter, and the prisoner was entitled to an acquittal. This charge the court gave.

" 2. That the person of every free white-man is sacred in

Noles v. The State.

law, and every arrest, or attempt to arrest him, without warrant or other legal authority, is a violation of his rights, to which he is not bound to submit, and if he can only prevent such unlawful arrest by taking the life of the aggressor, he has a right to do so ; therefore, if Sharp and his company, having no warrant or other legal authority to arrest the prisoner, went to his house, intending to arrest him, and then and there attempted to arrest him, and such arrest could only be prevented by taking the life of Sharp, then the prisoner is entitled to an acquittal. This charge the court refused, and the prisoner excepted.

" 3. If Sharp and his company went to the prisoner's house to arrest him, without warrant or other legal authority, the prisoner was not bound to submit to that arrest, nor was it necessary for him to fear or believe that Sharp and his company intended to commit a felony, or to commit such violence on his person as to produce to him great bodily harm ; but, in order to preserve, protect, and defend his liberty, he had a right to resist and prevent this unlawful arrest ; and if, while doing so, Sharp and his party still persisted in their determination and attempt to arrest the prisoner, then the killing of Sharp is not more than manslaughter at the most ; and if the arrest of the prisoner could not be prevented otherwise than by killing Sharp, then such killing is neither murder, nor manslaughter, and the prisoner should be acquitted. This charge, as a whole, the court refused, and the prisoner excepted.

" 4. If Sharp and his company went to the prisoner's house, intending to arrest him on any charge not amounting to felony, and the prisoner had fled, or refused to submit to the arrest, then, if Sharp and his company could not arrest him without taking his life, and the prisoner had been killed by Sharp,—then such killing would have been murder in Sharp and his company, so consenting to the same. This charge the court gave."*

(The fifth charge requested is not stated in the record.)

" 6. When a man acts under a necessity, malice is not implied from such acts, but such acts are referred to the necessity under which he acts. This charge the court gave as asked."

The jury, by their verdict, " say, they find the prisoner guilty

of murder in the first degree, and penitentiary for life "; and the court thereupon sentenced him to confinement in the penitentiary for life.

All the matters covered by the exceptions above stated, together with the judgment rendered on the verdict, are now assigned for error.

THOS. WILLIAMS and GEO. W. GAYLE, for plaintiff in error:

1. The court erred in admitting parol proof that the prisoner's wife had made an affidavit against him, when the court had just excluded the affidavit itself.

2. The court erred, also, in permitting Burns to testify that he had authorized Sharp to go and arrest the prisoner, and that he gave him the paper which he had issued, when the court had previously excluded the warrant itself.

3. As to the charges given and refused : Self-defence includes the right " to preserve, protect, and defend " personal liberty, as well as life, limb, or property ; and therefore, " to preserve, protect, and defend " his personal liberty, a man has the same right " to repel force by force" that he would have to defend life, limb, or property.—Constitution of Alabama, (Code, p. 30,) §§ 9, 11; 12 Ala. 840 ; 8 Pick. 133 ; 8 Durn. & E. 79 ; 3 Ired. 92. Every arrest of a freeman without warrant, unless it be under a charge of felony, is unlawful, and he may use as much force as is necessary either to prevent the arrest, or to effect his escape if arrested ; and if he cannot prevent this unlawful arrest, or regain his liberty, but by slaying the aggressor, he has the right to do so, and cannot be convicted of any offence for so doing—at least, not of murder in any degree.—Stevenson's case, 10 State Trials 462 ; Tooley's case, 2 Ld. Raym. 1296 ; Pickett's case, 3 Camp. 68; 1 Stark. Rep. 246, or 2 Serg. & L. 376; Thompson's case, 2 Moody's Crown Cases, p. 80 ; Curvan's case, ib. 132 ; 1 Hale 455-6 ; Cro. Car. 371 ; Cook's case, ib. 537 ; Fost. 319 ; 8 Pick. 133 ; 1 Russ. on Crimes, m. p. 630-1; Roscoe's Cr. Ev., m. p. 751; 1 East's P. C. 310 ; 5 Yerg. 459; 1 Mann. (Mich.) 451; Wharton's Am. Cr. Law, p. 254.

M. A. BALDWIN, Attorney General, contra:

1. There was no error in permitting witness Burns, the jus-

tice, to state that the wife of Noles, the prisoner, had made an affidavit before him, and that he (Burns) communicated this fact to prisoner, and read him the affidavit. No ground of objection is stated.—Sally's Adm'r v. Caps, 1 Ala. 121; Planters' & Merch. Bank v. Borland, 5 *ib.* 543; Baldwin v. Carter, 17 Conn. 201; 12 S. & M. 161.

2. The charges given by the court are more favorable to the prisoner than the law really is.

3. Both the second and third charges asked were correctly refused; for, although a man may repel force by force in defence of his person, habitation or property, against all who manifestly endeavor, by violence or suspicion, to commit a known felony, (1 East P. C. 272; 1 Hale P. C. 445; Whar. Cr. Law 254,) yet the law will not justify him in taking life for the purpose of preventing a mere trespass to property, or an assault upon his person, which does not threaten a felony or great bodily harm.—1 East 287; 1 Russ. on Crimes 519; Whar. 235; Oliver v. The State, 17 Ala. 598; Carroll v. The State, 23 *ib.* 36; The State v. Morgan, 3 Ired. 192; McCoy v. The State, 3 Eng. 454; Commonwealth v. Drew, 4 Mass. 396; United States v. Weltberger, 3 Wash. C. C. 521; The State v. Smith, 3 Dev. & Batt. 117; United States v. Travers, 2 Wheeler's Cr. Cas. 497, 509; The State v. Craton, 6 Ired. 173; People v. John Doe, 1 Mich. 456.

4. Killing an officer for arresting one illegally, is extenuated to manslaughter.—1 Chit. Cr. Law 23; 1 Russ. 519; Whar. 236-7; 1 Russ. 512.

5. If the party killing upon provocation (as for an assault, illegal restraint, and the like) make use of a deadly weapon, it is murder.—1 East P. C. 233; 1 Russ. 515, and notes; Jacob v. The State, 3 Humph. 517.

6. An attempt illegally to arrest a person is no greater trespass and provocation than an assault upon his person. For assaults on the person, no one is justified in taking the life of the assailant, unless to save his own life, or prevent some great personal injury; and the necessity must be imminent, and the party assailed must retreat, unless in so doing he endangers the chances of safety.—Roscoe 770; 1 Russ. 517.

7. The nature of the weapon used must be looked at, to determine the degree of homicide.—Arch. 416; 1 Russ. 520.

8. The charge must be considered in reference to the testimony in the case. The charge asked should have contained a proviso to the effect that Noles had used all means in his power otherwise to save his own life, or prevent the intended harm ; such as retreating as far as he could, or disabling his adversary, without killing him, if in his power.—1 Mich. 456; People v. John Doe, *supra*.

9. No arrest had been made or attempted when the killing took place.—4 Mass. 396 ; 1 Mich. 456.

10. Was the killing under such a necessity, real or apparent, as the law requires before one is allowed to take the life of another ?

11. The verdict is plain and intelligible, and that is all that is necessary.—See Code, § 3080 ; The State v. Stephen, 15 Ala. 534; Nance v. The State, 6 *ib.* 483 ; Noles v. The State, 24 *ib.* 694 ; Pettis v. Bingham, 10 N. H. 519 ; Schlenker v. Bisley, 3 Scam. 483; Bank v. Batty, 4 *ib.* 200; State v. Yancey, 3 Brevard 144; State v. Fuller, 1 Bay 243; Hawks v. Crofton, 2 Bur. 698; Nabors v. The State, 6 Ala. 201; 1 Chitty's Cr. Law 644.

RICE, J.—To excuse one individual for taking the life of another, there must exist a necessity to prevent the commission of a felony or great bodily harm, or a reasonable belief in the mind of the slayer that such necessity does exist. If there is neither the existence of such necessity, nor any reasonable belief of its existence, the law will not acquit the slayer of all guilt.—Oliver v. The State, 17 Ala. 587; Pritchett v. The State, 22 *ib.* 39.

The case of a mere trespass upon the person and liberty of the slayer, which created no reasonable belief in his mind that any of the trespassers would commit any felony or do him any great bodily harm, cannot be allowed to constitute an exception to the foregoing rules. When such trespass is threatened or committed, he has no *right* to kill, unless the unlawful act, when properly and lawfully resisted by him, is persisted in by the trespasser, until it ultimately results either in an actual necessity on his part to kill in order to prevent the commission of a felony or great bodily harm, or in the reasonable belief by him of the existence of such necessity.

Carroll v. The State, 23 Ala. 28; State v. Craton, 6 Ired. 164.

Believing the foregoing legal propositions to be correct, and being bound to construe the charges and refusals to charge in connection with the evidence, we cannot do otherwise than declare, that there is no error in the charges given, nor in the refusals to charge as requested, of which the prisoner has any right to complain.

We admit the right of any citizen to resist any attempt to put any illegal restraint upon his liberty. But his resistance must not be in enormous disproportion to the injury threatened. He has no right to kill, to prevent a mere trespass, which is unaccompanied by any imminent danger of great bodily harm or felony, and which does not produce in his mind any reasonable belief of such danger. We cannot sanction the charges asked by the prisoner and refused by the court, to the full extent to which they go.

Any fact which tended to prove what was the real motive of the prisoner for killing the deceased, or the purpose of deceased in going to the house of the prisoner, or which tended to prove that at the time of the killing the prisoner knew that the deceased and his companions did not intend to commit any felony, or do him any great bodily harm, was relevant evidence. In this point of view, the evidence excepted to by the prisoner was admissible.

The prisoner did not object to this evidence on the ground that the affidavit and warrant were not produced ; they had just been offered by the State, and been excluded on the objection of the prisoner. The only question raised by the objection was as to the relevancy of the evidence as offered ; and as it was relevant, there was no error in overruling the objection. If the prisoner had objected on the ground that the affidavit itself and warrant were not produced, and the affidavit and warrant had not then been produced, we would have been called on to decide whether such an objection should have been sustained. But as it is not presented in that way, we do not intimate an opinion on that question.— Allen v. Smith, 22 Ala. 416.

The verdict is sufficient to sustain the judgment and sentence.—Noles v. The State, 24 Ala. 672.

We are fully convinced that there is no error against the

prisoner, in any of the proceedings, which authorizes a reversal of the judgment and sentence pronounced by the Circuit Court of Dallas county; and we affirm said judgment and sentence, and direct said sentence to be carried into execution.