# DUPREE *vs.* THE STATE.

[INDICTMENT FOR MURDER.]

1. *Admissibility of threats by deceased towards prisoner.*—Threats, made by the deceased a short time before the commission of the homicide, indicating an angry and revengeful spirit towards the prisoner, and a determination to do violence towards his person, which were communicated to the prisoner before the homicide, are admissible evidence for him.

2. *Admissibility of conduct of deceased towards servant or agent of prisoner.*—The conduct of the deceased, in going to the prisoner's premises, several weeks before the commission of the homicide, and there seeking a personal difficulty with a person who was in the employment of the prisoner, is not admissible evidence for the prisoner.

3. *Competency of person of mixed blood as witness.*—A person whose great-grandmother was the daughter of a mulatto, by a negress, is not a competent witness against a white person, (Code, § 2276,) although his father, maternal grandfather and great-grandfather were white men.

4. *Secondary evidence of testimony of absent witness.*—A written statement of the testimony given by a witness on the coroner's inquest cannot be received in evidence, although it is shown that the witness has since removed from the State.

5. *Mode of proving character.*—The bad character of the deceased cannot be established by proof of particular facts, showing misconduct or immorality, having no connection with the case ; as that he was an escaped convict from the penitentiary of another State.

6. *Admissibility of prisoner's character as evidence.*—The character of the prisoner, for peaceable disposition and habits, is competent evidence for him.

7. *Competency of witness to testify to character.*—A person who is acquainted with the prisoner's character, and who has known him for eight or ten years, is competent to testify to his character, although he may have resided more than twenty miles distant from the prisoner's residence.

8. *Charges on law of self-defense.*—The prisoner having requested the court to instruct the jury, " that if they believed from the evidence there was a reasonable belief in his mind of some great personal injury or bodily harm about to be committed on him by the deceased," or " that there was reasonable ground on his part to believe that he was in danger of great bodily harm from the deceased, whether it actually existed or not, then the killing under the circumstances would be excusable ;" and the court having refused to give the charge, " except with the qualification that, if the danger appeared to be imminent or threatening, the prisoner would be excused,"— *held*, that neither the refusal of the charge as asked, nor the qualification added to it, was erroneous.

APPEAL from the City Court of Mobile.

Tried before the Hon. ALEX. MCKINSTRY.

THE prisoner, William H. Dupree, was indicted for the murder of one Smith, whose given name was alleged to be unknown to the grand jury, by shooting him with a gun; was convicted of manslaughter in the first degree, and sentenced to imprisonment in the penitentiary for three years. On the trial, as appears from the bill of exceptions, the State proved, that the deceased was shot and killed, on Sunday, the 1st day of August, 1858, at Twenty-one-mile bluff in Mobile county; and, for the purpose of showing that the prisoner was the perpetrator of the homicide, introduced as a witness one Lawrence Gregory, a youth of about sixteen years of age, whose testimony was as follows :

"Witness was near the prisoner's house on Sunday, and was sitting at a landing under an oak tree, when he heard the cries of a female slave of the prisoner's as if receiving severe punishment. He heard her screams, and heard the sound of blows, like that of a whip, as he thought, distinctly. He did not count the blows, and was unable to say how many he heard. Just after, or at the time of hearing the blows, he saw the prisoner coming out of his house, with his gun, and running down towards the cabins from which the noise of the blows and screams proceeded. The cabins were about fifty or sixty yards from the prisoner's house, and about twenty yards from the river. When the prisoner got within ten or fifteen steps of the cabins, he stopped about a half minute, as witness thought; then raised his gun, and fired; put down the gun; then raised it again, and fired the second time; and then turned, and ran towards his house. After the prisoner ran, witness saw Smith, for the first time, come out from behind the cabins, and run towards the prisoner; but he never got to the place where the prisoner stood when he shot. Smith ran fifteen or twenty yards from the cabin, turned round, and, after walking back some few steps, fell, and said he was a dead man. Witness thought the distance between him and the place where Smith fell might have been from one hundred and fifty to two hundred yards, but never measured it. He did not see Smith until he ran out from behind the cabin, and heard

no words pass between him and the prisoner. He did not see that Smith had either gun, whip, stick or knife, when he ran towards the prisoner. Immediately after the shooting, witness went near where Smith lay, and then went to tell what had happened. When he returned with some of the neighbors, they found the prisoner there; and the knife, stick and whip, hereafter mentioned, were there found. Witness afterwards saw Smith's body under an oak tree; it had been removed three or four steps from where he fell. He had seen Smith before that morning, who appeared to have been drinking; saw him go down to a grog-shop, which was about a quarter of a mile below the prisoner's house. There were two cabins on the prisoner's place, about eight yards apart, besides his dwelling; all within his enclosure. This negro woman and her children lived in one of them. These cabins, or one of them at least, were between witness and Smith."

"This was the only testimony as to the killing, but there was other evidence showing that Smith had been drinking the day he was killed." The State then introduced evidence showing the holding of the coroner's inquest on the body of the deceased, the character of the wounds which he received, the relative situation of the parties, in the opinion of the witnesses, at the time the deceased was shot, and his attitude and position at the moment; all of which, however, are immaterial matters as the case is here presented. "The prisoner then introduced one Williams as a witness, who testified, that he went to the prisoner's lot for some water on the Thursday next before the killing, and there met the deceased; that the deceased told him, that the prisoner's folks had been killing his chickens, and that he intended to kill the prisoner's chickens, and that, if the prisoner said a word about it, he would cut his throat; that he remonstrated with the deceased, but the latter said he would kill the prisoner before he left that place; that he also said, on witness further remonstrating with him, 'damn Dupree, he would kill him anyhow;' that Dupree was then absent from home; that witness, knowing the violent character of Smith, felt alarmed for Dupree and his family, and

accordingly went over to his house, on Saturday night before the killing, to warn him of his danger; that Dupree had not returned home when witness got to his house, and witness then determined to remain there all night to protect his family; that witness lived about three miles from the place; that Dupree returned between 9 and 10 o'clock that night, when witness told him of all these threats, and advised him to get out a peace-warrant; that the last words spoken by witness to Dupree that night were to caution him against Smith, whom witness had known for two or three years, and thought him a quarrelsome and dangerous man, especially when he was drinking.  At the time the testimony of this witness was received, no objection was made to the same by the State; but, after the evidence on each side was closed, the solicitor moved the court to exclude from the jury the evidence of this witness, as to all the threats he had heard the deceased make against the prisoner, his household and family, which had been communicated by the witness to the prisoner; which motion was sustained by the court, and the prisoner excepted."

" The prisoner offered to prove, by a witness named Ladd, that he had heard Smith, on the day before the killing, say that he would whip Dupree; which was not communicated by him to the prisoner.  The court ruled out this evidence, also, and the defendant excepted; but the court offered to admit any evidence of threats against the negro woman.  The defendant then offered to prove, by one Boyd, that Smith, about three weeks before the killing, had threatened Dupree in a violent manner, and exhibited at the time his loaded whip; which threats were communicated to Dupree before the killing.  The court excluded this evidence, also, on motion of the solicitor, but still offered to admit any evidence of threats against the negro woman; and the defendant excepted. The defendant then offered to prove, by a witness named Keen, that the deceased came into Dupree's premises, some weeks before the killing, with his loaded whip, and went to one of the cabins in the lot, where his hireling, a white man named Breedlove, then stayed, and com-

menced a difficulty with Breedlove, and threatened to whip him, and was only prevented from executing these threats by witness and two other men then living there; and that this was communicated to Dupree before the killing. The court excluded this evidence, also, on the solicitor's motion, but still offered to admit any evidence of threats against the negro woman; and the defendant excepted.

"The defendant offered to introduce the testimony of Mrs. Smith, the wife of the deceased, which had been given before the coroner's inquest, reduced to writing, and sworn to, after having proved that such was really and fully her testimony, and that she had removed to Georgia, shortly after her husband's death, and was now supposed to be there. The court refused to let the testimony be read, and the defendant excepted.

"The defendant offered three witnesses, aged nine, eleven, and thirteen years, who were the children of the woman Clara; and proposed to prove by them, that they were present at the killing, that it was done in self-defense, and the circumstances under which it took place. The solicitor then stated to the court, that these boys, as he had been informed, were not competent witnesses, being of mixed blood; and proposed to examine witnesses as to the condition of their mother and ancestors. The children were produced, and appeared to be white. One Norton testified, that the woman Clara was the mother of the children by defendant, a white man; that Clara was a mulatto; that her mother was a negress in appearance; that he had known them six or eight years only, and knew nothing of their ancestors. One Brown testified, that Clara, from her looks, was half-and-half; that her mother was black—not as black as some negroes, but too dark for a griffe; that Clara's children were by a white man; that her father was a white man, named Simon Chastang, and her grandmother was Jean Simon, or Seymour; that her mother, who was named Anastasia, was blacker in appearance than her grandmother; that her mother was dark griffe, and her husband, as he understood, was a white man; and that he had known some of

them since 1830. One Hatter testified, that he had known Clara and her mother for six or seven years; that Clara was a mulatto, while her mother appeared to be a regular negress—she was black, her nose flat, and her hair kinky. W. B. Brown testified, that he had known Clara and her mother for several years, but knew nothing of their ancestors; that he thought Clara, from her appearance, was a mulatto, and that her mother was black. The defendant then introduced William Fisher as a witness, who was a gentleman about sixty years of age, and a creole born in the city of Mobile, and who testified, that Clara, her mother, and probably her grandmother, who was named Jean Seymour, were born at Twenty-one-mile bluff on the Mobile river, below the 31st degree of north latitude, and had always lived there; that Anastasia, the mother of Clara, was about his age, but he did not distinctly remember Clara's age; that Jean Seymour was a griffe, and had white blood in her—was dark in color, but not entirely black; that Anastasia was the daughter of a white man, Simon Andre by name, who always lived with Jean as her husband; that they were called man and wife in Spanish times, before the change of flag, and had several children, who were all about the color and appearance of Anastasia; that Jean never had any other husband than said Simon Andre, and everybody recognized her children as his; that Simon Andre and Jean had both been deceased many years; that Anastasia's only husband was a white man, named Chastang, who was the father of Clara; that Clara was recognized by everybody as Chastang's child, and her children were by a white man; that these colored women were always free, and owned slaves and other property; and that they were treated as husbands and wives under the Spanish laws. This being all the evidence on this point, the court decided that the witnesses were not competent, on account of being of mixed blood; to which ruling of the court the defendant excepted."

"There was evidence tending to show, that the prisoner tried to avoid all difficulties with the deceased; that he was of a quiet and peaceable character, and, among his

neighbors, *was not considered so.* (?) The prisoner offered to introduce witnesses to prove his character, who lived in Mobile, twenty-one miles from the place of killing, had known him for eight or ten years, and were acquainted with his character for peace, &c.; but the solicitor objected to their introduction, and the court excluded them; to which ruling of the court the prisoner excepted.

" The detendant also produced a witness, who testified, that he had a requisition for Smith, at the time of the killing, as an escaped convict from the penitentiary of Georgia; and that he had informed the prisoner of this before the killing. This evidence, also, on motion of the solicitor, the court rejected; and the defendant excepted.

" The defendant asked the court to charge the jury—

" 1. That if they believed from the evidence before them that there was a reasonable belief in the mind of the accused of some great personal injury or bodily harm about to be committed on him by the deceased, then he can be excused for taking life.

" 2. That if the jury believe from the evidence, and from the circumstances of the case as detailed by the witnesses, that there was reasonable ground on the part of the accused to believe that he was in danger of great bodily harm from the deceased, whether it actually existed or not, the killing under the circumstances would be excusable.

" The court refused to give either of these charges, except with the qualification, 'that if the danger appeared to be imminent or pressing, either upon the defendant or upon his servant, he would be excused;' to which refusal the defendant excepted."

Daniel Chandler, for the prisoner.

M. A. Baldwin, Attorney-General, *contra.*

(No briefs have come to the reporter's hands.)

A. J. WALKER, C. J.—The threats, proved by the witnesses Williams and Boyd, were made but a short time before the commission of the homicide. They were communicated to the prisoner before the homicide, by the

persons who heard them uttered. They were indicative of an angry and revengeful spirit, and of a determination to do violence to the prisoner's person. Such threats were admissible in this case, and the court erred in excluding them.—Powell v. The State, 19 Ala. 577; Carroll v. The State, 23 Ala. 28; Howell v. The State, 5 Geo. 48; Monroe v. The State, 5 Geo. 85; The State v. Zellers, 2 Hals. 280; Shorter v. The People, 3 Coms. 193; Am. Law of Homicide, 216; Campbell v. The People, 16 Ill. 17; Cornelius v. Commonwealth, 15 B. Monroe, 539.

[2.] The facts proved as to the conduct of the deceased, some weeks before, towards Breedlove, were irrelevant to the issue in this case. They pertained to a distinct and independent transaction, having no connection, which we perceive, with this case, and were properly excluded.

[3.] The children of Clara were incompetent witnesses. Their father, maternal grandfather, and great-grandfather were white men. Their great-grandmother was the child of a mulatto, by a negress. The great-grandfather is the first ancestor of pure white blood, to whom the genealogy of the witnesses can be traced. Beyond the great-grand ancestors, the ancestors of both sexes were either negroes, or of mixed blood. If the descent of the witnesses is traced downward from their great-grand-parents, one of whom was white, their grand-parents are of the first generation, their parents of the second, and they themselves of the third generation. It follows, that if in determining the competency of the witnesses, we are to reckon from the ancestors, one of whom was white, the witnesses proposed in this case are in the third generation.

The section of the Code pertaining to this question is as follows: "Negroes, mulattoes, Indians, and all persons of mixed blood descended from negro or Indian ancestors, *to the third* generation inclusive, though one ancestor of each generation may have been a white person, whether bond or free, must not be witnesses in any cause, civil or criminal, except for or against each other."—Code, § 2276. This statute must be understood as requiring a computation of the generations from ancestors one of whom is purely white; otherwise, it might be that persons of mixed

blood, by intermarriage among themselves, might produce descendants, competent to testify against white men, without any admixture of additional *white* blood in any generation. We hold, that there must be one white ancestor, of each generation, for three generations, before a competency to testify can be established; and the proposed witnesses, being of the third generation, were incompetent to testify, and there was no error in rejecting them as witnesses.

[4.] The statement of the testimony given in by the widow of the deceased, before the coroner on his inquest, was not admissible. She was living. The testimony was not that of a deceased witness. No reason is suggested for the admissibility of the evidence, save that the witness had emigrated to Georgia. There is no rule, which would justify the admission of such testimony on that ground.

[5.] So, also, the proof that the deceased was a convict, escaped from the Georgia penitentiary, was inadmissible. Particular acts of misconduct on the part of the deceased, and offenses against the law committed by him, and not connected with this case, were inadmissible. For a still stronger reason, parol evidence of his having been a penitentiary convict was inadmissible. It is not allowable to go into proof of particular acts, unconnected with the case, to show the character of the deceased.—State v. Nugent, 18 Ala. 521; Pritchett v. State, 22 Ala. 39; Franklin v. State, 29 Ala. 14.

[6.] The character of the prisoner for peaceful disposition and habits was competent proof for him.—Felix v. The State, 18 Ala. 720.

[7.] The witnesses, by whom it was proposed to show the character of the accused, had known him for eight or ten years, and were acquainted with his character. This was sufficient to qualify them to testify as to his character, notwithstanding they may have resided more than twenty miles from him. Residence in the immediate vicinity of the person, whose character is the subject of investigation, is not an indispensable qualification of a witness to testify as to the character. Such a remoteness of residence would not prove that the witness did not

know what the character was, and therefore would not disqualify him to testify on the subject.—Hadjo v. Gooden, 13 Ala. 718; Martin v. Martin, 25 Ala. 201.

[8.] There was no error, either in the refusal of the court to give the charges asked, without a qualification, or in the qualification of them, as stated in the bill of exceptions.—Oliver v. The State, 17 Ala. 587; Harrison v. The State, 24 Ala. 67; Noles v. The State, 26 Ala. 31. The charges asked might have misled the jury, by making the impression upon them that the plea of self-defense· was sustained, although there was not a reasonable belief of a *present* necessity to strike for his own protection. This court will never reverse for the refusal of a charge, the tendency of which is to mislead the jury.

The judgment of the court below is reversed, and the cause remanded.