[No. 2846.]

## JESSE DYSON v. THE STATE.

SELF-DEFENSE—CHARGE OF THE COURT—CASE STATED.—The evidence in a trial for manslaughter disclosed that while the defendant and his brother were quietly deporting themselves on a public street, the deceased, not being an officer, and without shadow or claim of lawful authority, rushed upon the brother of the defendant with a drawn pistol, and seized him by the collar, commanding him to hold up his hands, and attempted to drag him before the sheriff; whereupon a struggle ensued, during which the pistol of the deceased was discharged, and immediately thereafter the defendant shot and mortally wounded the deceased. *Held*, that it was the right of the assaulted party to resist unlawful arrest, and, under the circumstances of this case, to employ all means necessary to make such resistance effectual. *Held*, further, that the right of the defendant was identical with that of his brother, the assaulted party; wherefore the trial court should have charged in substance that if from the evidence, looking to all the surrounding facts, it reasonably appeared to the defendant that it was necessary to shoot and kill the deceased in order to liberate his brother, he should be acquitted. See the opinion *in extenso* for an elaboration of the subject.

APPEAL from the Criminal District Court of Orange. Tried below before the Hon. W. H. Ford.

The indictment in this case charged the appellant with the murder of Lewis Jackson, in Orange county, Texas, on the thirtieth day of March, 1881. A previous trial resulted in a conviction of murder in the second degree, which conviction was reversed by this court. Manslaughter was the only issue presented by the State upon this trial; of which offense the appellant was convicted, and his punishment assessed at two years in the penitentiary.

F. Mulligan was the first witness introduced by the State. He testified that he knew the defendant by sight, and was acquainted with the deceased in his life time. The deceased was killed on the streets of the town of Orange, about two months or thereabouts before this indictment was found. He was killed by the defendant, who shot him twice with a pistol, one shot taking effect in the side of the body, and the other, which was a glancing shot, in the side of the head. The witness was at that

time standing at the Sample Room saloon, fifty or sixty feet distant.

A short time before the difficulty which culminated in the homicide, the deceased came to the shop of the witness and invited him to take a drink. The witness accepted the invitation, and went with the deceased to the Sample Room saloon. The deceased turned abruptly from the counter and went rapidly out at the front door of the saloon. Within a few seconds the witness heard loud talking and cursing on the sidewalk, and went out at the front door of the saloon to see what it was about. When the witness reached the sidewalk he saw the deceased and Isaac Dyson scuffling. The deceased had Isaac Dyson by the shoulder or collar with his left hand, while in his right hand he held a pistol which was pointed up. Isaac Dyson had hold of the deceased's pistol hand, or perhaps had hold of the pistol itself. The deceased appeared to be endeavoring to pull Isaac Dyson off down the street. During the scuffle the pistol in the deceased's hand was discharged, and just then the defendant stepped up from the direction of the opposite side of the street and fired upon the deceased twice and ran. The deceased did not release Isaac Dyson after he was shot until Doctor Brazeale and some others pulled them apart. When the pistol of the deceased was discharged it seemed to be pointed up. When the defendant shot the deceased, he and Isaac Dyson had stopped scuffling, but were still standing in close contact, both clutching the pistol, and the deceased still grasping Isaac Dyson's collar. The witness did not at any time see the deceased point his pistol at Isaac Dyson, but heard him tell Isaac Dyson that he was going to take him, Dyson, to the sheriff.

Cross-examined, the witness stated that he saw no pistol in in the hands of the deceased when the latter passed from the saloon to the street. About the time that the deceased passed out of the saloon the witness saw some one passing upon the street, but, as his view was obstructed by the blind doors or screens, he could not see who the party or parties were. He could not say that they were or were not the defendant and Isaac Dyson. It was the loud talking which attracted the attention of the witness and caused him to leave the saloon and go to the sidewalk. The witness heard the deceased tell Isaac Dyson that he, deceased, was going to take him, Dyson, to the sheriff. He heard Dyson reply: "Turn me loose; I am not going." The deceased did not release Isaac Dyson. About thirty minutes

elapsed between the time that witness came out of the saloon and the shooting of the deceased. Several parties were present during the difficulty, but no one attempted to interfere until after the deceased was shot. The witness saw, after the difficulty was over, where the ball from the deceased's pistol went through the shed over the sidewalk. The deceased lived several days after he was shot. The witness did not see the beginning of the difficulty. Jackson, the deceased, was a larger man than Isaac Dyson.

A. C. Stewart testified, for the State, that he was standing on the sidewalk in front of what, at the time of the difficulty between the deceased and Isaac Dyson, was known as Kohn & Brothers' store, but since as the Daisy saloon, about forty or fifty feet distant from the point where the shooting occurred. While standing there the deceased passed him in a rapid walk, speaking to him as he passed. A few minutes later the witness's attention was attracted by a disturbance down the street. Looking in that direction he saw the deceased and Isaac Dyson scuffling with each other. Deceased had a pistol in his right hand, and with his left he had hold of Isaac Dyson's collar. Dyson had hold of the pistol also, and appeared to be resisting the efforts of the deceased to drag him down the street. While this scuffle was going on, the deceased's pistol was discharged, but whether intentionally or by accident, the witness could not say. Just after deceased's pistol was discharged the defendant stepped rapidly from the street to the sidewalk and shot the deceased twice. The witness could hear nothing that was said by the parties.

Cross-examined, the witness said that he did not see Isaac Dyson with any kind of a weapon at the time of the difficulty, and knew that he did not draw a weapon of any kind. No one attempted to stop the difficulty until after the deceased was shot. The deceased was a much larger man than Isaac Dyson, and seemed to be trying to force him down the street. But few seconds elapsed after the deceased's pistol went off until he was shot by the defendant. The deceased did not release Isaac Dyson after he was shot until Doctor Brazeale and others interfered. The pistol of the deceased appeared to be pointed upwards when it was discharged.

B. C. Miller, for the State, testified that when the difficulty occurred, he was standing on the sidewalk, near what is now known as the Daisy saloon, but then occupied as a store by Mr.

Fancher. This was about ten or twelve feet from where the shooting took place. Isaac Dyson was standing near the Daisy saloon, and, the witness believed, was leaning against the building. Neither he nor the defendant were doing or saying anything at the time. The deceased came running down the sidewalk from the direction of the Sample Room saloon with a pistol in his hand, pointing upwards. Just as he passed the witness, he called to Isaac Dyson, "Hold up your hands;" and, still holding his pistol up with his right hand, grasped Isaac Dyson's collar with his left, and told him that he was going to take him, Isaac Dyson, to the sheriff, and attempted to pull Dyson off down the street. Isaac Dyson replied: "You have no right to arrest me; I have done nothing to be arrested for, and I am not going." Dyson resisted the deceased's efforts to arrest him, and, in the scuffle which ensued, got hold of the hand of the deceased in which he held the pistol. During all this time the pistol was held pointing upwards. In this position the pistol of the deceased was discharged, but the witness could not say whether intentionally or by accident. Immediately the defendant stepped up to within about six feet of the deceased, and fired upon him twice in rapid succession. Isaac Dyson called out, "Don't shoot him any more," and the defendant turned and ran off. When the shooting occurred, the deceased and Isaac Dyson had quit scuffling, but deceased still held Isaac by the collar, and both had hold of the pistol. The witness did not see the deceased point the pistol towards Isaac Dyson.

Cross-examined, the witness stated that the defendant was standing behind him, witness, during the scuffle between the deceased and Isaac Dyson. Isaac Dyson had no weapon at the time, that the witness saw, and did not draw any during the difficulty. But two or three seconds elapsed between the discharge of the deceased's pistol and the shots fired by the defendant. Defendant did not shoot again after Isaac Dyson told him not to. No one attempted to separate the combatants until after the shooting, when Dr. Brazeale separated them and disarmed the deceased. Neither of the Dysons were doing or saying anything when the deceased assaulted Isaac. The deceased's pistol was held up during the scuffle, and Isaac Dyson seemed to be trying to keep the muzzle from towards his person.

A. McKay testified, for the State, that he saw a part of the difficulty between Isaac Dyson and the deceased. He saw them scuffling over a pistol which the deceased appeared to be hold-

ing aloft in his right hand, and which Isaac Dyson appeared to be trying to get hold of. While it was held up between these two parties, the defendant shot the deceased twice, and ran. Witness was too far distant to hear what was said by the parties, if anything. He saw nothing in the way to prevent the defendant from seeing the position of the deceased's pistol when it fired.

D. K. Brazeale testified, for the State, that the difficulty between the deceased and Isaac Dyson took place in front of his, witness's, store. From the inside of his store, where he was at the time, the witness heard the deceased say to Isaac Dyson: "Hold up your hands; I am going to take you to the sheriff." Witness then stepped to the door, within seven or eight feet of the parties, and saw the deceased and Isaac Dyson scuffling over a pistol which was held up in his right hand by the deceased. Deceased had Isaac Dyson by the collar with his left hand. The witness turned to go back into the store, at which time the deceased's pistol was discharged. He turned back immediately and saw the defendant shoot the deceased twice and run. Deceased did not release Dyson after he was shot until the witness took him off and disarmed him. His pistol was a Smith and Wesson, thirty-eight calibre.

W. R. Sutherland testified, for the State, to the same effect, and almost in the same language of the witness B. C. Miller.

Eugene Poinboeff testified, for the State, that he was acquainted with the defendant, and knew the deceased before his death. Both lived near the witness, across the Sabine river, on the Louisiana side. About ten days before the killing, the defendant, armed with a pistol, which he showed the witness, came to witness's house and enquired for the deceased. He said that the deceased had been imposing on him, and that trouble would result if he did not desist; that he, the defendant, would use that pistol on the deceased.

Isaac Dyson was the first witness for the defense. He testified that he and the defendant were brothers. He and the defendant were walking on the streets of Orange on the day mentioned in the indictment, and just as they stepped upon the sidewalk at the point where the shooting occurred, the witness heard some one running up behind. He turned to see who it was, and, as he did so, the deceased ran up, presented his pistol at the witness's breast and ordered him to hold up his hands, saying that he was going to arrest the witness and take him to the

sheriff.  The witness replied to the deceased that he had no right to arrest him, and that he had done nothing to be arrested for.  Thereupon the deceased shoved his pistol against the witness's breast and again ordered him to throw up his hands.  The witness knocked the pistol up, and a scuffle over it ensued, the deceased trying to get it down so as to cover the witness's person, and the witness struggling to keep it up.  When this scuffle began, the defendant jumped behind the witness.  While scuffling for the pistol in deceased's hand it was discharged, the ball grazing and slightly wounding and powder burning the witness's hand.  Immediately the defendant shot the deceased twice.  The witness told him not to shoot again, and he did not.  Throughout the difficulty the deceased was trying to get his pistol down to shoot the witness, but was prevented by the witness.  After the deceased was shot, Doctor Brazeale and a railroad conductor took the pistol from deceased, whereupon the witness released it.  A. W. Butler, who was standing near, took charge of the witness.  The witness was positive that the deceased said that he would shoot him, witness, unless he held up his hands.  Witness showed his wounded hand to Mr. Butler, Charles Delano and Captain Junker.

The substance of the testimony of James Harris, a witness for the defense, was that the deceased appeared to be endeavoring to get his pistol down on Isaac Dyson, and Isaac Dyson was trying to prevent him.  The three shots were fired in rapid succession.

District Clerk R. H. Smith testified, for the defense, that the deceased was not at the time of his death, nor had he ever been, a peace officer in Orange county.

Miller, Brazeale and Sutherland, recalled in rebuttal, testified that they did not see the deceased point his pistol at Isaac Dyson, nor did they hear him say that he would shoot Isaac Dyson if he did not hold up his hands.

Among other grounds the motion for new trial set up that which is involved in the opinion of this court.

*W. Chambers* and *J. T. Hart*, for the appellant.

*J. H. Burts*, Assistant Attorney General, for the State.

HURT, JUDGE.  Jesse Dyson was convicted of the murder of Lewis Jackson, the conviction being for murder in the second

degree. He appealed to this court; and at the last Galveston term of this court the judgment was reversed and the cause remanded. Being tried again, he was convicted of manslaughter, and his punishment was assessed at two years confinement in the penitentiary. From this last judgment he again appeals to this court.

The case made by the State, that upon which it must rely in order to support the conviction, after eliminating all evidence which is favorable to the defendant, is this: Isaac Dyson and his brother Jesse Dyson, the defendant, were, on the thirtieth day of March, 1882, walking quietly and peaceably along the sidewalk of the town of Orange. Lewis Jackson, the deceased, a larger man than Isaac Dyson, without any authority or pretension of authority, and not being an officer of the law, with his pistol drawn and held muzzle up, rapidly approached Isaac Dyson and commanded him to hold up his hands. Jackson seized Dyson by the collar with his left hand, holding his pistol in his right, with the muzzle still elevated. When Jackson seized Dyson he told him that he intended to take him, Dyson, to the sheriff. Dyson replied: "You have got no right to arrest me; I have done nothing to be arrested for, and I am not going." Jackson then began to drag Dyson off, and, Dyson resisting, a scuffle between them ensued. Dyson caught hold of his arm or hand, or perhaps the pistol, the scuffle continuing—Jackson attempting to drag Dyson off, and Dyson still resisting. When the pistol went off Jesse Dyson immediately fired and shot Jackson twice. Jackson, however, did not release Isaac Dyson until after the second shot. Jesse Dyson fled. This rencontre was attended with loud talking and swearing.

The theory of defense was that, when the arrest was made, Jackson ran up to Isaac Dyson, pointing his pistol at his breast, telling him to throw up his hands, etc., and that when the pistol fired, Jackson was attempting to shoot Dyson.

Defendant was placed upon trial for manslaughter. The court below confined the jury to this offense only.

Justifiable homicide was the sole defense interposed by the defendant. A successful interposition of this defense was, by the charge, made to depend on the existence of these facts, to wit: That it reasonably appeared to the defendant from the acts, or words coupled with the acts, of Jackson, that it was the purpose and intent of Jackson to commit the offense of murder, and that Jesse Dyson killed Jackson while he was in *the act* of *com-*

*mitting* the offense, or after same act done by Jackson showing, evidently, an intent to commit such offense; and that the attack upon the person of Isaac Dyson, in order to justify Jesse, was such as created a reasonable expectation or fear of death or some serious bodily injury. If all of these facts were true, most certainly the defendant could plead them in support of his defense of justification. But under the facts of this case—those relied upon by the State—was it proper and just to the defendant for the court by its charge to charge justification alone upon the existence of these facts? Was it necessary, in order to the defendant's justification, for the acts, or words coupled with the acts, of Jackson to show the purpose and intent to commit murder? Or was it necessary that the defendant should kill Jackson while he was in the act of committing the offense, or after some act done by Jackson showing evidently an intent to commit such offense? If so, this violent, unauthorized and wanton arrest and detention of Isaac Dyson, and the outrageous attending circumstances, are not in this case, and in this investigation cannot be looked to except as lights by which the acts of Jackson are to be viewed in determining whether or not he intended to murder Isaac Dyson or do him some serious bodily injury.

The authorities are not harmonious, but the great weight of authority holds that a man will not be justified if he kills in defense against an illegal arrest of *an ordinary character*. Yet the law sets such a high value upon the liberty of the citizen that an attempt to arrest him unlawfully is esteemed a great provocation; such as will reduce a killing to manslaughter in resisting such an arrest. (*Calvin* v. *The State*, 6 Caldw., Tenn., 291; *Commonwealth* v. *Drue*, 4 Mass., 391; *Noles* v. *The State*, 26 Ala., 31; *Rex* v. *Curran*, 1 Moody C. C., 132; 1 Hale P. C., 457; *Roberts* v. *The State*, 14 Mo., 146; *Com.* v. *Carey*, 12 Cush., 246; *Tackett* v. *The State*, 3 Yerg., 392.)

"On the other hand, while this is the general rule, still the killing may be done under such circumstances of deliberation or cruelty as will afford proof of express malice, in which case it would be murder." As when the prisoners had been some time in custody, and the informality of the warrant under which they were held was unknown to them, and they deliberately planned and carried out an attack which resulted in the death of one of the officers; this was held murder, and not manslaughter. (*Rex* v. *Allen*, 17 Law Times.)

Let us return to the first proposition, which is that of a killing

which takes place in defense of an illegal arrest of *an ordinary character*. Against an illegal arrest of an *ordinary character* the killing will be manslaughter. ' Now, suppose the arrest is illegal and of an *extraordinary character;* suppose it is of a violent and dangerous character, attended by circumstances of great enormity, will the killing still be manslaughter? The charge of the court answers this question in the affirmative, unless the aggressor was in the act of, or had done, some act showing evidently an intention to kill Dyson or do him some great bodily injury. To this proposition we cannot agree. And why can we not sanction such a proposition? Our reasons are these:

First. Isaac Dyson was in the right.

Second. Jackson was the aggressor.

Third. Dyson *had the right to regain his liberty.*

Fourth. Jesse Dyson, the brother of Isaac, had the right to liberate his brother.

Fifth. The right to *regain his liberty carried with it the right to use all necessary means to accomplish the end,* and the party deprived of his liberty had the right to the initiatory step to effect the result, and was not bound to await some act on the part of the aggressor tending to show an intention to kill or do him some serious bodily injury. The issue was false imprisonment or liberty, and not alone whether Dyson was in danger of his life or some serious bodily harm.

If, therefore, Dyson had the right to regain his freedom at all hazards, by the use of any and all means necessary to effect that end, by what rule are the juries to determine when a resort to means *deadly* in their character becomes *necessary?* That which obtains in passing upon the necessity of resorting to such means in resisting aggressions upon property, home or person. "In resisting aggressions upon property and person he may stand his ground and repel force by force, taking care that the force employed does not exceed the bounds of mere self-defense and prevention, and that it does not become enormously disproportionate to the injury threatened. To be effective it may be a superior force to that which it is sought to control and overcome." In expelling an intruder from his home, or in regaining his freedom, he may use just such force as is required to expel the intruder, or to regain his liberty; and in order to be successful he may not only place himself upon an equal footing with the aggressor, but may resort to those means which are

sufficient to overpower and control that to which his adversary has resorted.

If, therefore, to expel the intruder, or regain his liberty, the use of deadly weapons in a deadly manner is *necessary* to control and bring into subjection the means used by the aggressor, he may so use these weapons, even to the taking of the life of his adversary.

Let us here illustrate: A ruffian enters A.'s home, and while in the same uses insulting or obscene language, or does some act offensive to A. or his family. A. commands him to leave. He refuses to do so. He is a much larger man than A., in fact is his physical superior. Must A. resort to nature's weapons and try his strength with the intruder? This would be not only folly but useless and inevitably unsuccessful. But as A. has the right to expel this intruder, he resorts to weapons which are not in their nature deadly, and reiterates his demand to leave. The intruder draws a "Bowie" knife, intending it for immediate use if necessary, but makes no attempt to use it, nor does any act showing evidently an intention to commit a felony, but replies that he will not go, but that he intends to stay. A. seizes his loaded gun and again orders him to depart. The aggressor replies, with weapon ready, that he will not; that he intends to remain. Can A. shoot, or must he await legal redress? Having the right to expel the ruffian, he has the right also to use any and all means necessary to consummate this right. Then, we answer, that he can shoot.

Are not the principles contained in this illustration applicable to the case in hand? Does the case made by the evidence relied on by the State require these principles to be submitted to the jury by proper instruction from the court below? Unquestionably it does. Jesse Dyson and his brother Isaac were quietly and peaceably walking along the street. The deceased, Jackson, without any pretense of being an officer even, and without a shadow of authority or claim of authority, drew his pistol and with loud oaths rushed upon Isaac Dyson, commanding him to hold up his hands, and seized him by the collar, and attempted to drag him before the sheriff. Dyson tells him that he has no right to arrest him; that he had done nothing for which to be arrested, and that he would not go with him to the sheriff. A struggle ensues, Jackson, with one hand in Dyson's collar, in a violent and wanton manner endeavoring to carry Dyson off, with his pistol in a position for immediate use. Dyson on the

other hand was demanding to be released, and was resisting his efforts to be taken off by Jackson. Whilst thus engaged Jackson's pistol fired, the muzzle being up. When the pistol fired, Jesse shot and killed Jackson. Jesse's rights being precisely the same as Isaac's, what should the jury have been told by the charge? In substance that, if from the evidence, looking to all of the surrounding facts, it reasonably appeared to the defendant that it was necessary to shoot and kill Jackson in order to liberate his brother, they should acquit him.

(The Reporters will give the evidence.)

The charges given by the court upon the subject of justifiable homicide were applicable to the other phase of the case, to wit, that which was presented by the evidence which tended to prove that Isaac Dyson was in danger of loss of life or some serious bodily harm. There is no part of the charge which attempts to apply the principle above enunciated to this case, though the counsel for defendant, in their charge number two, twice called the attention of the court to this view of the case.

We will not discuss the action of the court in refusing a new trial because of the application to postpone the trial or continue the cause. Because the law applicable to the case was not given in charge to the jury, the judgment is reversed and the cause remanded.

*Reversed and remanded.*

Opinion delivered June 20, 1883.